[No. S143615. Jan. 28, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
FERNANDO LOPEZ, Defendant and Appellant.

## Counsel

Mark D. Lenenberg, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Mary Jo Graves, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, Mary Sanchez, Kristofer Jorstad, Linda C. Johnson and Michael A. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

Steve Cooley, District Attorney (Los Angeles), Lael Rubin, Brentford J. Ferreira and Roberta T. Schwartz, Deputy District Attorneys, for Los Angeles County District Attorney as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—In this case, a jury convicted defendant, a Catholic priest, of seven sex offenses involving three teenage youths. The Court of Appeal reversed the convictions, concluding that the prosecutor committed misconduct in her closing and rebuttal arguments to the jury, and that defense counsel's failure to object to the misconduct violated defendant's constitutional right to the effective assistance of counsel. We hold that the prosecutor's comments were not misconduct and that defense counsel was not incompetent for not objecting.

### I

#### A. *Victim Gerardo V.*

Gerardo V., who lived with his grandmother, attended school and religious services at Saint Thomas the Apostle Parish (St. Thomas), a Catholic church in Los Angeles. One day when he was approximately 13 years old, he made his confession to defendant, a priest at St. Thomas. In the confession, which took place in an office rather than a confessional because the church had been destroyed in a fire, Gerardo said he had engaged in sexual activity with his girlfriend. Defendant asked for details. At the end of the confession, defendant hugged Gerardo, who noticed that defendant had an erection.

When Gerardo's grandmother later became terminally ill, defendant helped Gerardo in running errands for his family in defendant's car. On four different occasions when Gerardo was 13 or 14 years old, defendant engaged in sexual conduct with him in the car, once touching his penis, twice masturbating him, and once orally copulating him. Another time, when Gerardo was working in the church office, he asked defendant if he could confess. Defendant told Gerardo to come to defendant's bedroom, where he masturbated Gerardo and orally copulated him.

#### B. *Victim Luis B.*

When Luis B. was 19 or 20 years old, he attended church services at St. Thomas and got in line for confession. Defendant, the priest on duty, told Luis to come to his office. When Luis did so, defendant escorted Luis to his

bedroom. After removing his own shirt, defendant helped to take off Luis's shirt. When Luis tried to leave, defendant locked the bedroom door and told him not to leave because it would not look good for Luis to come out of defendant's bedroom without a shirt on. Defendant then removed Luis's pants and put his hand on Luis's penis. When Luis asked him not to do so, defendant told Luis that "all the guys liked it." Defendant kept Luis's hand on defendant's penis and masturbated. Defendant told Luis to swear that he would never tell anyone what happened.

### C. Victim Nicolas M.

When Nicolas M. was 16 years old, he visited his brother Edgar, an employee at St. Thomas. Edgar introduced Nicolas to defendant, who put his arm around Nicolas and squeezed his chest. Thereafter, defendant repeatedly telephoned Nicolas at home to talk about sports and Nicolas's confirmation. Once when Nicolas was 17 years old, defendant telephoned and invited Nicolas to dinner. As they were driving to the restaurant, defendant held Nicolas's hand and rubbed Nicolas's leg above the knee. After the meal, defendant said he was going to take Nicolas to visit defendant's mother. Instead, he drove to a deserted area, where he took off his seatbelt, pulled Nicolas's head over so that they were cheek to cheek, and rubbed Nicolas's legs and groin outside of his clothing. When defendant tried to put his hand inside Nicolas's pants, Nicolas asked where defendant's mother worked. Defendant put his seatbelt on and drove Nicolas home.

On another occasion, Nicolas attended a church-sponsored retreat in Victorville in Southern California. When Nicolas went to make his confession, it was defendant who heard the confession, which took place in a room with bunk beds. After Nicolas confessed to defendant that he had been sexually active, defendant rubbed Nicolas's leg and held his hand. Placing his hand on Nicolas's neck, he drew Nicolas over so that their heads were cheek to cheek. When they were back in Los Angeles, they attended a ceremony at St. Thomas for people who had attended the Victorville retreat. After the ceremony, defendant took Nicolas to the church basement to get a broom. There he sat next to Nicolas and rubbed Nicolas's leg and inner thigh.

### D. Criminal Charges

Defendant was charged with five felonies: with respect to Gerardo V., four counts of engaging in a lewd act on a child who was 14 or 15 years old and

at least 10 years younger than defendant (Pen. Code, § 288, subd. (c)(1)); and as to Luis B., one count of sexual battery by restraint (*id.*, § 243.4, subd. (a)). With respect to Nicolas M., defendant was charged with three misdemeanors: one count of sexual battery (*id.*, § 243.4, subd. (e)(1)), and two counts of annoying or molesting a child under the age of 18 (*id.*, § 647.6, subd. (a)(1)). At trial, Gerardo, Luis, and Nicolas testified as described above. Testifying in his own defense, defendant denied engaging in the sexual conduct attributed to him by the three victims. The jury convicted defendant on all counts, and the trial court imposed a prison term totaling six years eight months.

## II

The Court of Appeal held that the prosecutor engaged in three types of misconduct in her closing and rebuttal arguments to the jury: (1) She asked the jury to view the crimes through the eyes of the victims; (2) she argued a theory of guilt by association, attempting to link defendant to other priests who had committed acts of molestation; and (3) she expressed her personal belief in defendant's guilt. The Court of Appeal acknowledged that the lack of an objection at trial barred defendant from arguing on appeal that the prosecutor's conduct required reversal of his convictions. Nevertheless, the Court of Appeal reversed the judgment because, in the court's view, defense counsel's failure to object denied defendant his constitutional right to the effective assistance of counsel. We examine that holding below.

We begin with a summary of the well-established legal principles governing claims of prosecutorial misconduct and ineffective assistance of counsel, followed by an analysis of the three types of prosecutorial misconduct at issue here.

■ "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the *federal* Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; see *People v. Cash* (2002) 28 Cal.4th 703, 733 [122 Cal.Rptr.2d 545, 50 P.3d 332].) Under *state law*, a prosecutor who uses deceptive or reprehensible methods commits misconduct even when those actions do not result in a fundamentally unfair trial." (*People v. Cook* (2006) 39 Cal.4th 566, 606 [47 Cal.Rptr.3d 22, 139 P.3d 492], italics added; see also *People v. Hoyos* (2007)

41 Cal.4th 872, 923 [63 Cal.Rptr.3d 1, 162 P.3d 528]; *People v. Ledesma* (2006) 39 Cal.4th 641, 726 [47 Cal.Rptr.3d 326, 140 P.3d 657].)

■ "A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." (*People v. Thornton* (2007) 41 Cal.4th 391, 454 [61 Cal.Rptr.3d 461, 161 P.3d 3].) A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel. The appellate record, however, rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)

■ "In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it 'fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms.' [Citations.] Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.] If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.]" (*People v. Ledesma, supra,* 39 Cal.4th at pp. 745–746.)

We turn now to the three types of prosecutorial misconduct at issue here.

A. *Guilt by Association*

In her closing statement, the prosecutor argued to the jury: "[H]ow do we assess [defendant's] credibility? . . . [I]t is not enough to bolster his credibility that the defendant is a priest in the Catholic Church. And I imagine

[defense counsel] will make much of that fact, the fact that he is a priest. And he will want you, as the defendant did, . . . to think about the fact that priests do good works and they are motivated by good intentions. But we know that priests are human just like any other person. They commit sins as the defendant said, and *they commit crimes, and they commit horrendous crimes.*" (Italics added.)

■ That comment, according to the Court of Appeal, was improper. Noting "the almost daily news accounts of the scandal in the Catholic Church over pedophile priests," the Court of Appeal reasoned that "the jury was certain to think the prosecutor was referring to this scandal and suggesting that defendant played a part in it." To argue "guilt by association," the court stated, "constitutes misconduct."[1] The latter statement correctly reflects the law. (See generally *People v. Castaneda* (1997) 55 Cal.App.4th 1067, 1072 [64 Cal.Rptr.2d 395]; *People v. Galloway* (1979) 100 Cal.App.3d 551, 563 [160 Cal.Rptr. 914]; *People v. Chambers* (1964) 231 Cal.App.2d 23, 28 [41 Cal.Rptr. 551].) But the prosecutor here did not argue "guilt by association" by linking defendant to highly publicized acts of sexual misconduct by Catholic priests.

The prosecutor pointed to testimony by prosecution witnesses that defendant ordinarily dressed casually, wearing short-sleeved shirts, jeans, and sandals. But at trial defendant wore his clerical collar, and defense counsel mentioned in his opening statement that defendant was "loved in the church." The defense presented testimony that defendant was known as Father Fernando, that he "became a priest to help people," and that he was a "pretty popular priest" who was still a clergyman notwithstanding the criminal charges against him. By reminding the jury of defendant's profession as a priest, the prosecutor argued, the defense was conveying to the jury the subtle message that because defendant was a priest he must be telling the truth when he denied the accusations of sexual molestation, because, in the prosecutor's words, "priests do good works and they are motivated by good intentions." The prosecutor urged the jury to judge defendant by the evidence, not by his occupation as a priest. She explained: "[I]t is not enough [for defendant] to just say he is a priest so you should believe him. That's a violation of what the jury instructions tell you." That argument simply asked the jury not to give defendant *favorable* treatment just because he happened to be a priest. This was proper. (See generally *People v. Gionis* (1995) 9 Cal.4th 1196, 1219 [40 Cal.Rptr.2d 456, 892 P.2d 1199] [prosecutor's argument that jury should

---

[1] Defendant claims that the prosecutor's comment was also improper for a reason different from the Court of Appeal's "guilt by association" theory: the prosecutor's statement that priests "commit horrendous crimes" was misconduct, defendant asserts, because the record contains no evidence of horrendous crimes by priests. The prosecutor's comment, however, simply expressed the idea that because priests are human, they, like others, are capable of committing horrendous crimes. There was no impropriety in the comment.

not give the defendant favorable treatment merely because he could afford a nationally known attorney was proper].)

There was another argument by the prosecutor that the Court of Appeal characterized as an improper theory of guilt by association. The prosecutor argued to the jury: "The defendant also revealed in direct examination with me [*sic*] a general philosophy, for lack of a better word, that rules do not apply for him. *He made it very clear that he was given a lot of training, that [his pastor] explained to you as well, about how to behave with minors here in Los Angeles. And we all know why those rules are in place. This is not a surprise to any of us that the Church has these rules.* [¶] What did the defendant tell you about those rules? Well, he said they are in place for a good reason, but since I had a good reason to violate them that was okay. What does that mean? That means that, in general, the defendant thinks rules don't apply to him." (Italics added.) Unlike the Court of Appeal, we do not view this comment as asking the jury to find defendant guilty by association, by linking him to pedophile priests.

Both defendant and his superior, Father Jarlath Cunnane, testified at trial that the Archdiocese of Los Angeles had a policy prohibiting priests from having minors in their living quarters and discouraging priests from having minors alone with them in their cars. It is reasonable to infer that the purpose of this policy was to avoid accusations of sexual misconduct with minors by priests. Although the prosecutor made a passing reference to this policy in her argument to the jury, she did not tell the jury that it should find defendant guilty by association, by linking him to pedophiliac priests. Her mention of the archdiocese's policy was simply to point out to the jury that defendant knew of the rules and deliberately broke them.

Because the prosecutor's arguments discussed above were not improper, there was no reason for a defense objection. Therefore, the failure to object did not result in a violation of defendant's constitutional right to the effective assistance of counsel. (*People v. Dickey* (2005) 35 Cal.4th 884, 915 [28 Cal.Rptr.3d 647, 111 P.3d 921].)

B.  *Asking Jurors to Stand in the Victims' Shoes*

In her closing argument to the jury, the prosecutor said she expected defense counsel to argue that the victims lacked credibility because they could not remember certain details about the rooms in which the sexual misconduct occurred. In anticipation of that argument by the defense, the prosecutor told the jury: "[P]ut yourself in that situation. . . . I will pick someone at random. Juror Number 12. I'm going to take Juror 12 back in the jury deliberation room. I'm going to take a flashlight and beat him up bad. I

won't really. And it's going to last about 10 minutes. And then you are going to leave and you are never going to go in that room again. And four years from now I'm going to put you on that witness stand and I'm going to say 'What magazines were on that side table? What color was the rug?' Are you going to remember the flashlight? Are you going to remember me? Are you going to remember maybe what you are wearing and how many stitches you got in your head? Probably. Are you going to remember the color of the carpet? No. Does that mean that you are not going to accurately remember and testify about me beating you up? No."

Later, the prosecutor made a similar comment in discussing victim Gerardo V.'s testimony that one of the acts of molestation occurred in defendant's bedroom, that the room had a piano, but that he could not remember other items in the room. The prosecutor argued: "This means that the defendant is lying when he says that Gerardo was never [in defendant's bedroom]. Think about it this way: If I picked one of you out at random. Juror Number Five. And I said, 'Tell me what's in my bedroom.' You could probably guess some stuff and get it right. You'd say bed. You'd say dresser. You'd say alarm clock. And from those answers no one would know whether you have been in my bedroom or not . . . because I have all those things in my bedroom. Everybody has those things in their bedroom. [¶] What if you said something really weird? I have this weird clock that's made from the head of a baby doll and then on top of it is this dial that comes up. It's very weird. . . . If you, Juror Number Five, said 'There's this weird clock with a baby head and dial that freaked me' people would know . . . that is something specific and unusual that [lets] us understand that he's actually been in my bedroom. [¶] Well, a piano is a weird thing to have in your room, right? And what did Gerardo describe when [defense counsel] was pushing him about what is in that room? He didn't say bed or chest of drawers. He said piano and there's a piano in that room. So what does that mean? Just like Juror Number Five, he was in that room, because you are not going to pick piano off your top 10 list of things . . . that is in somebody's room."

In holding that prosecutorial argument to be improper, the Court of Appeal observed: "What the prosecutor was doing was asking the jurors to stand in the shoes of the victim witnesses. This is misconduct. As stated in *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 [17 Cal.Rptr.2d 174, 846 P.2d 756] . . . , 'an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial . . . .' "

It is true that ordinarily "a prosecutor may not invite the jury to view the case through the victim's eyes, because to do so appeals to the jury's sympathy for the victim." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1406 [58 Cal.Rptr.3d 368, 157 P.3d 973]; see also *People v. Stansbury, supra,* 4

Cal.4th at p. 1057; *People v. Fields* (1983) 35 Cal.3d 329, 362 [197 Cal.Rptr. 803, 673 P.2d 680].) In *Leonard*, which involved the coldblooded killings of six persons, the prosecutor told the jurors: " 'Imagine in that last millisecond before the lights go out, when you hear the report of the gun, when you feel the wetness . . . the small vapor of blood that is blown out the back or the side of their head and they fall to the floor, and in their last moment of consciousness, they think, I misjudged this man.' " (*People v. Leonard, supra,* 40 Cal.4th at p. 1407, fn. 7.)

Here, however, the prosecutor did not ask the jurors to view the crimes through the eyes of the victims. Rather, she gave two hypotheticals in which the victims did not at all figure. The first had her beat a juror with a flashlight in the jury deliberation room. She then made her point that four years later the juror, having never again visited the jury room, might not remember such details as the magazines on the table or the color of the rug but might vividly remember that the assault took place in the jury deliberation room. In the second hypothetical, the prosecutor asked a juror to imagine going into the prosecutor's bedroom and remembering an unusual piece in the room, namely, a "weird clock . . . made from the head of a baby doll." The juror's recollection of that one highly distinctive item in the room, the prosecutor argued, would tend to show his actual presence in the room containing that unusual item. Similarly, the prosecutor maintained, in this case victim Gerardo's testimony that he had been in defendant's bedroom was credible because he remembered a highly unusual item he saw there, namely, a piano. In neither scenario did the prosecutor ask the jurors to stand in the shoes of the victims, so as to evoke jury sympathy for the victims. We perceive no impropriety in the prosecutor's argument. Consequently, the Court of Appeal erred when it held that defense counsel's failure to object to that argument violated defendant's constitutional right to competent counsel. (See *People v. Dickey, supra,* 35 Cal.4th at p. 915.)

### C. *Expression of Belief in Defendant's Guilt*

In his closing argument to the jury, defense counsel accused the prosecutor of making personal attacks on him as a tactical maneuver to deflect the jury's attention away from the weaknesses in the prosecution's case. A prosecutor who does not "have the facts," he said, will "attack the defense lawyer for being such a mean person and being not so bright, because I asked dumb questions."

In her rebuttal, the prosecutor responded: "One thing that I heard quite a bit was that I made a lot of nasty comments about [defense counsel] yesterday. That I said he was mean and I said he was stupid. And in fact I didn't say any of those things and I don't think those things are true. [¶] In

fact I think [defense counsel's] style of thorough cross-examination was very helpful to my case because . . . [i]t showed over and over again the witness's [*sic*] demeanor, and their consistency from beginning to end. They weren't going to be confused by him. . . . They were going to listen to both of us and politely as best they could and as articulately as they are capable answer the questions. [¶] *I don't think [counsel] is mean or stupid. But I think his client is guilty.*" (Italics added.)

The Court of Appeal viewed the latter comment as misconduct, explaining that it reflected a personal belief in defendant's guilt, under circumstances that would cause the jury to conclude that the belief was based on evidence not presented at trial. We disagree.

■ "A prosecutor may not express a personal opinion or belief in the guilt of the accused when there is a substantial danger that the jury will view the comments as based on information other than evidence adduced at trial." (*People v. Mincey* (1992) 2 Cal.4th 408, 447 [6 Cal.Rptr.2d 822, 827 P.2d 388]; see also *People v. Huggins* (2006) 38 Cal.4th 175, 207 [41 Cal.Rptr.3d 593, 131 P.3d 995]; *People v. Frye* (1998) 18 Cal.4th 894, 975–976 [77 Cal.Rptr.2d 25, 959 P.2d 183].) The danger that the jury will view the prosecutor's expressed belief in the defendant's guilt as being based on outside sources "is acute when the prosecutor offers his opinion and does not explicitly state that it is based solely on inferences from the evidence at trial." (*People v. Bain* (1971) 5 Cal.3d 839, 848 [97 Cal.Rptr. 684, 489 P.2d 564].) Nevertheless, not all such comments are improper. Rather, "[t]he prosecutor's comments must . . . be evaluated in the context in which they were made, to ascertain if there was a substantial risk that the jury would consider the remarks to be based on information extraneous to the evidence presented at trial." (*People v. Mincey, supra*, 2 Cal.4th at pp. 447–448; see also *People v. Cummings* (1993) 4 Cal.4th 1233, 1303, fn. 48 [18 Cal.Rptr.2d 796, 850 P.2d 1]; *People v. Green* (1980) 27 Cal.3d 1, 35–36 [164 Cal.Rptr. 1, 609 P.2d 468].)

Here, the prosecutor's comment did not imply that she based her belief in defendant's guilt on evidence not presented at trial. To the contrary: Because her statement that she believed defendant was guilty immediately followed her comment that, in her view, defense counsel's cross-examination of the victims demonstrated that they were credible, a reasonable juror would most likely infer that the prosecutor based her belief in defendant's guilt on the credibility of the victims' testimony at trial.

Even if we were to assume, for argument's sake, that the prosecutor's comment was improper, defendant would still not be entitled to relief. As mentioned earlier, defense counsel did not object at trial to the comment, thus

forfeiting on appeal a claim of prosecutorial misconduct. Reversal of defendant's conviction would be warranted only if counsel's failure to object violated defendant's constitutional right to the effective assistance of counsel. But as we have pointed out, except in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal. (*People v. Mendoza Tello, supra*, 15 Cal.4th at pp. 266–267.) This is particularly true where, as here, the alleged incompetence stems from counsel's failure to object. "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502 [117 Cal.Rptr.2d 45, 40 P.3d 754]; see also *People v. Dickey, supra*, 35 Cal.4th at p. 914; *People v. Boyette* (2002) 29 Cal.4th 381, 433 [127 Cal.Rptr.2d 544, 58 P.3d 391].) Here, the record shows that defense counsel had good tactical reasons for not objecting to the prosecutor's argument or asking the trial court to tell the jury to disregard it.

In his closing statement to the jury, defense counsel expressed his personal belief that defendant was innocent. Counsel said: "I believe Father Lopez. Father Lopez has always said to me 'Mr. Moore, I didn't do this.' " Thus, one reason for defense counsel's failure to object when the prosecutor said that she believed in defendant's guilt may have been defense counsel's concern that the jury would find him a hypocrite for complaining about the prosecutor's argument ("But I think his client is guilty") when defense counsel himself had used a similar tactic, by expressing a belief in defendant's assertion of innocence. And defense counsel may have been concerned that asking the trial court to admonish the jury not to consider the prosecutor's expressed belief in defendant's guilt could lead the trial court to tell the jury to disregard the personal beliefs expressed by both the prosecutor and defense counsel. Such an admonition, defense counsel may have concluded, could have done the defense more harm than good by having the jury disregard defense counsel's expressed belief in defendant's innocence.[2]

---

[2] In his answer brief, defendant asserts that two other comments in the prosecutor's closing argument were misconduct. First, in discussing the jury instruction pertaining to the charge that defendant violated subdivision (a) of Penal Code section 647.6, which said that the prosecution had to prove that defendant was "motivated by an unnatural or abnormal sexual interest" in the victim, the prosecutor told the jury: "[W]e can probably have a debate out in the hall about whether any sexual interest in a child is anything other than abnormal or unnatural. But that's what the law requires." Second, the prosecutor argued that the victims in this case were particularly vulnerable to defendant's criminal acts because they were Catholic and had been brought up to trust priests, and that the prosecutor would not be similarly vulnerable because she was Protestant. Because these comments are not discussed in the Court of Appeal's opinion and are not mentioned in the Attorney General's petition for review, they are beyond the scope of our review.

## DISPOSITION

The judgment of the Court of Appeal is reversed, and the matter is remanded for further proceedings consistent with this opinion.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.