Filed 4/12/16  P. v. Garcia CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040078 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1117185) |
| v. | |
| ABEL ENRIQUE GARCIA, | |
| Defendant and Appellant. | |

Defendant Abel Enrique Garcia appeals from a judgment of conviction entered after a jury found him guilty of two counts of sexual penetration with a child 10 years or younger (Pen. Code, § 288.7, subd. (b)).[1]  The trial court sentenced defendant to 30 years to life in prison.  On appeal, defendant contends:  (1) the trial court erred when it failed to instruct the jury sua sponte to view his oral statements with caution; (2) the trial court abused its discretion and violated his due process rights when it admitted his prior misdemeanor conviction for impeachment purposes; (3) the prosecutor committed misconduct during closing argument; (4) the cumulative effect of the errors violated his right to a fair trial and due process; (5) trial counsel rendered ineffective assistance when he failed to object to the imposition of full consecutive life sentences; and (6) the abstract

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

of judgment should be corrected to reflect a five-year parole period. The judgment is modified to reflect a lifetime parole period. As modified, the judgment is affirmed.

## I. Statement of Facts
## A. Prosecution Evidence

In October 2011, nine-year-old Jane Doe lived with her mother Reina R., her father Rolando C., her 12-year-old brother Oscar, and a younger brother in San Jose. Defendant and his wife Maritza Herrera lived in the garage, which was attached to the main residence and had been converted into a separate living space. On the night of October 7, 2011, defendant's family was having a party which Reina and Rolando attended. Jane and Oscar were watching television at their residence.

When defendant knocked on the door during the party, Jane opened it. Defendant told her that her father had said that he could get some drinks from their house. After she told him that they were in the refrigerator, he asked her to show him. Jane went to the kitchen, opened the refrigerator door, and pulled out the drinks. Defendant was standing behind her. As she collected the drinks, defendant put his hand inside of her underwear and inserted his finger into her vagina "[a] couple" of times. He did not remove his hand until the two penetrations were complete. Defendant did not say anything to her during the incident. Jane told defendant to stop and tried to get away from him.

Jane went into the bathroom and closed the door. She was scared of being with defendant. While she was in the bathroom, she heard defendant calling her name. Meanwhile, Oscar heard defendant knocking on the bathroom door and saying his sister's name. Oscar told defendant that his sister was in the bathroom. According to Oscar, defendant "jumped and he got nervous" when he heard Oscar. It was dark and Oscar was wearing a black sweater. Defendant then left to take some of the drinks to the party.

2

Jane came out of the bathroom to see if defendant was still in the house. Defendant then returned to retrieve the rest of the drinks. Jane stood in the hallway and saw defendant in the kitchen. When he told her to come to him, she refused. As defendant was about to leave, he told Jane not to tell anyone.

After defendant left, Jane went into the bedroom where Oscar was watching television. Jane's eyes were red and it looked like she had been crying. Oscar asked her repeatedly what had happened. She told him that defendant had put his hand in her pants. At first, Oscar thought that she meant that defendant had tickled her. When she told him again what had happened, he realized that defendant had touched her and that they needed to tell their parents. Jane told him not to tell anyone, but Oscar went to find his parents at the party.[2]

Oscar found his father and told him that there was an emergency. As they were walking towards their house, Oscar told Rolando that Jane was very scared because defendant had touched her private parts. Rolando entered the bedroom and found Jane, who was shaking and crying. After Rolando spoke to Jane, he went outside to find defendant.

As Rolando was leaving the house, defendant approached him. Rolando confronted defendant and argued with him. Defendant told Rolando that he "hadn't done anything bad." Rolando did not know what "bad" meant to defendant. Defendant also mentioned that "Santa Muerte, which is the Holy Death was going to get him out of this." Rolando told defendant that there were laws in the United States that took this type of incident seriously.

---

[2] Jane was impeached with her prior inconsistent statements. Jane told the police and her mother that defendant lifted her leg when he touched her, but she testified at trial that he did not lift her leg. Jane also told the police that defendant touched her two to three times, but she testified at the preliminary hearing that she was touched seven times.

When Rolando did not return, Reina left the party to find out what had happened. She saw Rolando and defendant at the entrance to the house and they were very quiet. She found Jane in her bedroom. Jane, who was crying and shaking, told her mother that defendant had "lifted her left leg and stuck his hand inside her underwear." Jane also told her that defendant told her "not to tell anybody anything." Reina came out of the house with a phone in her hand and said that she was calling the police.

When defendant noticed that Reina was calling the police, he said, "Am I going to go to jail for sure? I'm going to go inside and I'm going to get a sweater." Reina called the police and reported the incident.

San Jose Police Officer Anthony Baza responded to the call at 8:00 p.m. He spoke with Jane, who was sobbing on her bed. She described the incident and identified defendant. The interview was recorded, transcribed, and played for the jury.

**B. Defense Evidence**

Defendant testified in his own behalf. Defendant and his wife had been living in the garage living space for almost two years. Defendant met Rolando through defendant's wife about five or six years ago. They were friends.

The party began around 4:00 p.m. on the day of the incident, but defendant and his wife left at 4:30 p.m. to go to work. Defendant returned at about 7:30 p.m. At about 8:00 p.m., defendant asked Rolando if he could have something to drink. Rolando sent defendant to get beers from the refrigerator in his house.

When defendant knocked on the door at Rolando's house, Jane answered it. Defendant told her that her father had sent him for some beer. She went to the kitchen and called to him to come and get them. Jane took the beers from the refrigerator and put them on the kitchen table. As Jane returned to the refrigerator for the remaining beers,

4

she slipped. Defendant put his hands on her back to hold her up. He then took some of the beers and left.

When defendant returned to the house to get more beer, no one was in the kitchen. He took six or seven bottles of beer and headed toward the door. As defendant was leaving, he said "Close the door, please." Defendant heard Oscar say, "Okay, in just a minute . . . ."

About 10 minutes later, Rolando confronted defendant and began insulting him. Defendant denied touching Jane. Defendant told Rolando, "I swear to you by my Holy Death or Santa Muerte that I didn't do anything." By this statement, defendant was assuring Rolando that he had not done anything wrong.

Defendant denied touching Jane inappropriately. He denied putting his finger in her vagina and he denied telling her not to tell anyone.

On cross-examination, defendant admitted that he had previously suffered a misdemeanor conviction for a crime of moral turpitude. When he was asked about his alcohol consumption that night, defendant stated that between about 7:30 p.m. and when the police arrived at 8:07 p.m., he drank one beer. Defendant denied that alcohol had any effect on his perceptions of the events that night.

The parties stipulated that defendant's blood was drawn at approximately 11:30 p.m. on the night of the incident and that his blood alcohol level was 0.10 percent.

**C. Rebuttal Evidence**

Francisco Alcantar, a toxicologist, testified as an expert in the areas of absorption and burn-off rates of alcohol and alcohol levels in blood. Alcantar opined that for a male weighing 150 pounds, with a blood alcohol level of 0.10 percent at 11:30 p.m., who had stopped drinking at 8:00 p.m., his blood alcohol level would have been 0.145 percent at

9:00 p.m.  According to Alcantar, it would take six to seven alcoholic drinks to reach that blood alcohol level.

## II. Discussion
### A.  CALCRIM No. 358

Defendant contends that the trial court erred when it failed to instruct the jury sua sponte pursuant to CALCRIM No. 358 to view his oral statements with caution.

Defendant focuses on the testimony of Jane and Rolando regarding his out-of-court statements.  Jane testified that defendant told her, "Don't tell anyone," after touching her.  Rolando testified that when he confronted defendant, defendant mentioned that "Santa Muerte, which is the Holy Death was going to get him out of this." According to Rolando, when defendant noticed that Reina was calling the police, he said, "Am I going to go to jail for sure?  I'm going to go inside and I'm going to get a sweater."

CALCRIM No. 358 states:  "You have heard evidence that the defendant made [an] oral or written statement[s] (before the trial/while the court was not in session).  You must decide whether the defendant made any (such/of these) statement[s], in whole or in part.  If you decide that the defendant made such [a] statement[s], consider the statement[s], along with all the other evidence, in reaching your verdict.  It is up to you to decide how much importance to give to the statement[s].  [¶]  [Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded.]"

At the time of defendant's trial, the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 358 when there was evidence of an out-of-court statement by the defendant.  (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189-1190 (*Diaz*).)  While this appeal was pending, *Diaz* abrogated this precedent and held that a trial court need only

6

give this instruction upon request. (*Id.* at pp. 1189-1191.) However, *Diaz* did not decide whether its ruling was retroactive, because the omission of the cautionary instruction was not prejudicial in that case. (*Id.* at p. 1195.)

In the present case, we also need not decide the issue of retroactivity, because any error in failing to instruct the jury with CALCRIM No. 358 was harmless. We assess prejudice under the standard for state law error, that is, "whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given. [Citation.]" (*Diaz*, *supra*, 60 Cal.4th at p. 1195.)

Here, the central issue for the jury to resolve was whether Jane or defendant was more credible as to the events of that evening. Jane's testimony that defendant told her not to tell anyone was a small part of her larger narrative of the incident. Defendant denied making this statement. Even assuming that the statement indicated a consciousness of guilt, Jane's claim that he made the statement did nothing to bolster her credibility. Regarding the statement that he better get his sweater if he was going to jail, this statement was neither incriminating nor an admission. It was his response to the fact that Jane's mother had called the police to have him arrested. Moreover, defense counsel argued that defendant did not flee when confronted with Jane's accusation and that defendant's statement indicated that he had nothing to hide. Defendant also denied that he had said to Rolando that "Santa Muerte, which is the Holy Death was going to get him out of this," but instead said, "I swear to you by my Holy Death or Santa Muerte that I didn't do anything." Defendant's invocation of a saint for protection does not tend to show guilt. In any event, as in *Diaz*, the jury was instructed pursuant to CALCRIM No. 226, "which sets out the numerous factors the jury may consider in deciding whether a witness's testimony is credible. '[W]hen the trial court otherwise has thoroughly instructed the jury on assessing the credibility of witnesses, we have concluded the jury

7

was adequately warned to view their testimony with caution.' [Citations.]" (*Diaz*, *supra*, 60 Cal.4th at p. 1196.)

In addressing the issue of prejudice, defendant first focuses on inconsistencies in Jane's testimony. Jane told the police and her mother that defendant lifted her leg when he touched her, but she testified at trial that he did not lift her leg. Jane also told the police that defendant touched her two to three times, but she testified at the preliminary hearing that she was touched seven times. She testified at trial that he touched her a couple of times. Given Jane's age and the passage of time, these inconsistencies are not significant. In any event, it is not reasonably probable that the result would have been more favorable to defendant if the trial court had instructed the jury pursuant to CALCRIM No. 358.

Defendant also argues that the present case is similar to *People v. Ford* (1964) 60 Cal.2d 772 (*Ford*).[3] Defendant's reliance on *Ford* is misplaced. In *Ford*, hostile witnesses testified regarding alleged oral statements by the defendant, who was charged with first degree murder. One witness testified that the defendant "said he wanted the bottle of liquor because he 'needed the drink to get up his courage,'" and the defendant "later fired the gun out of the car window because he 'wanted to see how it shot.'" (*Ford*, at p. 799.) Two witnesses testified that "on passing two parked police cars on the freeway defendant said, 'they'd better not give me any trouble or they are going to lose'; that as they passed [the deputy sheriff's] car parked on the road defendant said, 'he'd better not give me any trouble because he is going to lose'; that as defendant got out of the car to face [the deputy sheriff] he said, 'that son-of-a-bitch had better not give me any trouble'; and that after firing the fatal shot defendant made a kicking motion and said, 'that will be the end of you, you mother-fucker.'" (*Ibid.*) *Ford* reasoned: "These

---

[3] *Ford*, *supra*, 60 Cal.2d 772, was overruled on other grounds by *People v. Satchell* (1971) 6 Cal.3d 28, 35-36, which was overruled by *People v. Flood* (1998) 18 Cal.4th 470, 484-490.

8

statements bore directly on the issue of defendant's capacity to deliberate and premeditate sufficiently to commit first degree murder. They constituted a substantial part of the evidence offered to establish the prosecution's theory that the shooting of [the deputy sheriff] was deliberate and premeditated because defendant had formed an intent to kill any police officer who might interfere with his plans." (*Id.* at pp. 799-800.) *Ford* held that the trial court's failure to give on its own motion a cautionary instruction regarding the defendant's oral admissions constituted error. (*Id.* at p. 799.) In contrast to *Ford*, here, defendant's out-of-court statements did not constitute a substantial part of the evidence to establish the prosecution's case.

Nor are we persuaded by defendant's argument that jury deliberations of 15 hours and the jury's requests for readbacks of selected testimony demonstrated that the jury considered the case to be close. "[T]o conclude that this was a 'close case' in light of the jury's actions 'in the absence of more concrete evidence would amount to sheer speculation on our part. Instead, we find that the length of the deliberations could as easily be reconciled with the jury's conscientious performance of its civic duty, rather than its difficulty in reaching a decision.' [Citation.]" (*People v. Houston* (2005) 130 Cal.App.4th 279, 301.)

In sum, it is not reasonably probable that the jury would have returned a verdict more favorable to defendant had the trial court instructed the jury pursuant to CALCRIM No. 358.

### B. Admissibility of Prior Misdemeanor Conviction

Defendant also argues that the trial court abused its discretion and violated his due process rights when it admitted his prior misdemeanor conviction for impeachment purposes.

Defendant brought an in limine motion to exclude his 2010 misdemeanor domestic violence conviction under Evidence Code section 352.  In the event that the prior conviction was admitted, defendant also requested that "the court sanitize [it] by prohibiting the prosecution from admitting the facts underlying the charge itself."  The trial court took the matter under submission and stated that it would revisit the motion if defendant decided to testify.  When defendant later decided to testify, the trial court asked the prosecutor how the prior conviction would be described.  The prosecutor responded that she was planning to refer to it as a "crime of domestic violence," but she was "happy to phrase it however counsel may want."  The trial court ruled that the prior misdemeanor conviction was relevant to defendant's credibility and was not unduly prejudicial.  On cross-examination, the prosecutor asked defendant whether he had been convicted of a "misdemeanor crime of moral turpitude."  Defendant admitted the prior conviction without describing it.

*People v. Wheeler* (1992) 4 Cal.4th 284 (*Wheeler*), superseded by statute on other grounds as stated in *People v. Duran* (2002) 97 Cal.App.4th 1448, 1459, held that evidence of conduct underlying a misdemeanor conviction involving moral turpitude is admissible for impeachment purposes in a criminal proceeding.  (*Wheeler*, at p. 295.) *Wheeler* also held that using prior convictions to prove the underlying conduct constituted inadmissible hearsay.  (*Id.* at p. 300.)  However, the Legislature subsequently amended the Evidence Code to authorize the admission of official conviction records "to prove the commission, attempted commission, or solicitation of a criminal offense, prior conviction, service of a prison term, or other act, condition, or event recorded by the record."  (Evid. Code, § 452.5, subd. (b).)

" '[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude.  Beyond this, the latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual

10

cases is broad.' [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 931 (*Clark*).) Evidence Code section 352 provides that a trial court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify. [Citations.]" (*Clark*, at p. 931.) "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion. [Citations.]" (*Id.* at p. 932.)

Defendant does not dispute that a domestic violence conviction is a crime of moral turpitude. He argues, however, that "[t]he fact that [he] might have harmed his spouse under some unknown circumstances had little probative value as to his honesty and veracity."

As *Wheeler* recognized: " '[I]t is undeniable that a witness' moral depravity of any kind has "some tendency in reason" [citation] to shake one's confidence in his honesty. . . . [¶] There is . . . some basis . . . for inferring that a person who has committed a crime which involves moral turpitude [even if dishonesty is not a necessary element] . . . is more likely to be dishonest than a witness about whom no such thing is known. Certainly the inference is not so irrational that it is beyond the power of the people to decree that in a proper case the jury must be permitted to draw it . . . .' [Citation.]" (*Wheeler*, *supra*, 4 Cal.4th at p. 295.) Thus, the prior conviction had some probative value on the issue of defendant's credibility. The conviction was also not

11

remote in time since defendant had suffered this conviction a year before the charged offenses. Nor was the admission of this evidence unduly prejudicial. The prior conviction was not for the same or similar conduct as the charged offenses and its admission had no effect on defendant's decision to testify. Moreover, at defendant's request, evidence of the facts underlying the prior conviction was not admitted and the prosecutor agreed to refer to the conviction as a "misdemeanor crime of moral turpitude." Accordingly, the trial court did not abuse its discretion in admitting defendant's prior misdemeanor conviction for impeachment purposes.

Defendant also argues that the trial court compounded its error by failing to clarify the term "moral turpitude" in response to the jury's request.

During deliberations, the jury submitted questions to the trial court. The trial court discussed the questions and the proposed responses with defense counsel and the prosecutor. Neither party had any objection to the final version of the responses. One of the jury's questions asked the trial court to "define moral t[u]rp[i]tude" as it related to defendant's prior misdemeanor conviction. The trial court provided a written response: "The fact that the term moral turpitude was used during the trial to describe the defendant's prior bad act was for the Judge to decide in determining whether the bad act is of the type that is considered a moral turpitude crime. Do not speculate what the crime was. You may only use that fact in evaluating the credibility of the defendant and for no other purpose." The jury subsequently submitted a second question in which it asked: "Was the moral t[u]rpitude conviction related to events that occurred the evening of October 7, 2011?" The trial court's written response was that "[t]he prior conviction the defendant admitted to is not related in any way to the evening of October 7, 2011."

Defendant argues that the trial court should have disclosed to the jury that his prior conviction was for a misdemeanor domestic violence offense and that moral turpitude is defined as a "'readiness to do wrong.' [Citation.]"

12

Section 1138 provides that "when, after it has begun deliberating, the jury 'desire[s] to be informed on any point of law arising in the case, . . . the information required must be given . . . .' [Citation.] This provision imposes on the court the 'primary duty to help the jury understand the legal principles it is asked to apply.' [Citation.]" (*People v. Cleveland* (2004) 32 Cal.4th 704, 755.)

Here, defense counsel did not object to the responses given to the jury. Thus, the claim of error has been forfeited. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193.)

Defendant next contends that he was denied the effective assistance of counsel by trial counsel's failure to object to the trial court's responses to the jury.

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) " 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

13

different." [Citation.]' [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*).)

The trial court retains discretion to sanitize a prior conviction to avoid undue prejudice. (See *People v. Sandoval* (1992) 4 Cal.4th 155, 177-178.) The decision to seek to have a prior conviction sanitized is a tactical one. Here, trial counsel argued that defendant's prior conviction should be excluded because it involved an offense that "could inflame the passions of the jury so that he would be convicted on the basis of that crime and not the one currently before it." Alternatively, he sought that the facts underlying the conviction be excluded and the conviction be sanitized. Trial counsel could have reasonably concluded that the admission of a sanitized conviction would be less prejudicial than a domestic violence conviction. This strategy could, and did, result in speculation by the jury as to the nature of defendant's prior conviction. However, the trial court's responses instructed the jury not to speculate and to only consider the prior conviction for the purpose of determining defendant's credibility. We presume that jurors follow the trial court's instructions. (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.) In addition, the definition of moral turpitude would not have assisted the jury in assessing defendant's credibility. Accordingly, defendant has failed to establish that trial counsel rendered ineffective assistance.

### C. Prosecutorial Misconduct

Defendant also argues that the prosecutor committed misconduct during closing argument by vouching for Jane's truthfulness.

Defendant focuses on the following italicized statements that the prosecutor made during closing argument. "So how do you judge someone's credibility? . . . [¶] What was her behavior while testifying? And you really think about little [Jane] Doe. *She's an incredibly compelling witness. That little girl was telling you the truth.* [¶] Was her

14

testimony influenced by a personal interest in how the case was decided? *She has no dog in this hunt. She has no horse in this race.* This is not a fun process for an adult to go through much less a child. She has no motive in how this case would turn out. She has no reason that her testimony would be influenced." The prosecutor later stated: "I want to leave you with this and ask yourselves this: *Why on earth would this little girl make this up?* This is a horrible process to have to go through. It's not fun for her. There is no rainbow at the end of this tunnel for her. She doesn't get anything out of it. There's no personal gratification, no personal benefit, no nothing. *There is nothing for her in this process, other than her challenge to come in here and tell you her truth so that she can move on.* [¶] And that's the challenge I will leave with you. Your job is to find out what happened in this case, and really to verify her story. It's been tested. She's been cross examined. Other witnesses have come forward. The defendant had his day in court. That's what he is entitled to. You're not missing anything. *This is her story. She told it to you truthfully and honestly.*" Defense counsel did not object to the prosecutor's statements.

Defendant argues that trial counsel rendered ineffective assistance when he failed to object to the prosecutorial misconduct.

In order to show ineffective assistance of counsel, a "'defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citation.]'" (*Lopez*, *supra*, 42 Cal.4th at p. 966.) Defendant has not met his initial burden in the present case.

As *People v. Turner* (2004) 34 Cal.4th 406, stated: "A prosecutor may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom."'" [Citation.] But a 'prosecutor is prohibited from vouching for the credibility of witnesses or otherwise

15

bolstering the veracity of their testimony by referring to evidence outside the record.' [Citation.]" (*Id.* at pp. 432-433.) *Turner* held that it was improper for the prosecutor to vouch for the truthfulness of expert witnesses based on his personal knowledge of the witnesses and his use of these witnesses when he was a defense attorney. (*Id.* at p. 433.)

Here, in contrast to *Turner*, the prosecutor did not refer to evidence outside the record. She argued that Jane was a credible witness based on her demeanor, lack of bias, and no apparent motive to lie. As set forth in CALCRIM No. 226,[4] a jury may appropriately consider these factors in deciding a witness's credibility. Since an objection would have had no merit, trial counsel's performance was not deficient.

### D. Cumulative Error

Defendant contends that he was deprived of a fair trial and due process by the cumulative impact of the errors in the present case. We have found an assumed error to be nonprejudicial and have rejected his remaining claims. Accordingly, his contention of cumulative error fails. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1225.)

### E. Imposition of Full Consecutive Life Terms

Defendant next argues that trial counsel rendered ineffective assistance when he failed to object to the imposition of full consecutive life terms.

In the present case, the probation report recommended that defendant's two 15-to-life terms run consecutively. After stating that there had been discussion in chambers with both counsel, the trial court stated its intent to deny probation and to sentence

---

[4]     CALCRIM No. 226 states in relevant part: "In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are: [¶] . . . [¶] What was the witness's behavior while testifying? [¶] . . . [¶] Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?"

defendant to 30 years to life. The trial court articulated its sentencing decision as follows: "All right. Probation is denied. The defendant will be committed to the California Department of Corrections and Rehabilitation for 30 years to life. [¶] . . . [¶] On Count 1, he will receive 15 years to life and also on Count 2. Both offenses are violent sex crimes with same -- involving the same victim, separate occasions. Under section 667.6(d), there must be a consequent -- a consequent relationship between both counts. And, furthermore, the Court views Count 1 and 2 as separate counts of violence."

Section 667.6, subdivision (d) states in relevant part: "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions."

As the Attorney General concedes, the trial court erroneously imposed sentence under section 667.6, subdivision (d), because defendant was not convicted of an offense specified in section 667.6, subdivision (e).[5]

We thus consider whether defense counsel has met his burden of establishing "'that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] . . . If a

---

[5]     Section 667.6, subdivision (e) states: "This section shall apply to the following offenses: [¶] (1) Rape, in violation of paragraph (2), (3), (6), or (7) of subdivision (a) of Section 261. [¶] (2) Spousal rape, in violation of paragraph (1), (4), or (5) of subdivision (a) of Section 262. [¶] (3) Rape, spousal rape, or sexual penetration, in concert, in violation of Section 264.1. [¶] (4) Sodomy, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d) or (k), of Section 286. [¶] (5) Lewd or lascivious act, in violation of subdivision (b) of Section 288. [¶] (6) Continuous sexual abuse of a child, in violation of Section 288.5. [¶] (7) Oral copulation, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d) or (k), of Section 288a. [¶] (8) Sexual penetration, in violation of subdivision (a) or (g) of Section 289. [¶] (9) As a present offense under subdivision (c) or (d), assault with intent to commit a specified sexual offense, in violation of Section 220. [¶] (10) As a prior conviction under subdivision (a) or (b), an offense committed in another jurisdiction that includes all of the elements of an offense specified in this subdivision."

17

defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [Citation.]' [Citation.]" (*Lopez*, *supra*, 42 Cal.4th 960 at p. 966.)

Here, full consecutive life terms were not mandatory under section 667.6, subdivision (d) or any other statute. Thus, there can be no reasonable explanation for trial counsel's failure to object to the imposition of sentence. The Attorney General argues, however, that defendant cannot establish prejudice. We agree.

As defendant acknowledges, the trial court had the discretion to impose consecutive sentences. The probation report identified three aggravating factors in support of imposing consecutive terms: the defendant violated a position of trust; the defendant suffered prior crimes of increasing seriousness; and defendant was on probation. As a neighbor and family friend, defendant violated a position of trust. As to the second factor, defendant had three prior misdemeanor convictions: petty theft; battery on a spouse; and driving under the influence. Though defendant was on probation when the present offenses were committed, the probation report also noted that defendant's performance on probation was satisfactory. Since one factor in aggravation may support the trial court's imposition of consecutive sentences (see *People v. Osband* (1996) 13 Cal.4th 622, 728-729), it is not reasonably probable that the result would have been more favorable to defendant if trial counsel had objected to the error.

### F. Parole Obligation

The trial court imposed a 20-year parole obligation. Defendant contends that the abstract of judgment should be corrected to reflect a five-year parole obligation, since

18

section 3000, subdivision (b)(4)(A)[6] does not apply to convictions of section 288.7, subdivision (b). The Attorney General agrees that the trial court erred, but argues that the trial court should have imposed a lifetime parole obligation pursuant to former section 3000.1. We agree with the Attorney General.

When defendant committed his offenses, former section 3000.1, subdivision (a)(2) provided: "Notwithstanding any other provision of law, in the case of any inmate sentenced to a life term under subdivision (b) of Section 209, if that offense was committed with the intent to commit a specified sexual offense, Sections 269 *and* 288.7, subdivision (c) of Section 667.51, Section 667.71 in which one or more of the victims of the offense was a child under 14 years of age, or subdivision (j), (l), or (m) of Section 667.61, the period of parole, if granted, shall be the remainder of the inmate's life." (Stats. 2010, ch. 219, § 20, eff. Sept. 9, 2010, italics added.)

Defendant contends that former section 3000.1 is unambiguous and the use of the word "and" between sections 269 and 288.7 means that only persons convicted of violating both sections 269 and 288.7 are subject to mandatory lifetime parole. The Attorney General contends that the Legislature made a drafting error and that it intended that persons convicted of either section 269 or section 288.7 are subject to mandatory lifetime parole.

"[O]ur fundamental task is to ascertain the Legislature's intent so as to effectuate the purpose of the statute. [Citation.] We begin with the language of the statute, giving the words their usual and ordinary meaning. [Citation.] The language must be construed

---

[6]     Section 3000, subdivision (b)(4)(A) provides in relevant part: "Notwithstanding paragraphs (1) to (3), inclusive, in the case of a person convicted of and required to register as a sex offender for the commission of an offense specified in Section 261, 262, 264.1, 286, 288a, paragraph (1) of subdivision (b) of Section 288, Section 288.5, or 289, in which one or more of the victims of the offense was a child under 14 years of age, the period of parole shall be 20 years and six months unless the board, for good cause, determines that the person will be retained on parole."

19

'in the context of the statute as a whole and the overall statutory scheme, and we give "significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' [Citation.]  In other words, ' "we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' [Citation.]" ' [Citation.]  If the statutory terms are ambiguous, we may examine extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.]  In such circumstances, we choose the construction that comports most closely with the Legislature's apparent intent, endeavoring to promote rather than defeat the statute's general purpose, and avoiding a construction that would lead to absurd consequences.  [Citation.]" (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83 (*Smith*).)

It is a "basic principle of statutory and constitutional construction . . . that courts, in construing a measure, not undertake to rewrite its unambiguous language.  [Citation.] That rule is not applied, however, when it appears clear that a word has been erroneously used, and a judicial correction will best carry out the intent of the adopting body. [Citation.]  The inadvertent use of 'and' where the purpose or intent of a statute seems clearly to require 'or' is a familiar example of a drafting error which may properly be rectified by judicial construction.  [Citations.]" (*People v. Skinner* (1985) 39 Cal.3d 765, 775-776.)  Whether the use of the word "and" is, in fact, a drafting error "can only be determined by reference to the purpose of the section and the intent of the electorate [or legislature] in adopting it."  (*Id.* at p. 776.)

In our view, the meaning of "and" in former section 3000.1, subdivision (a)(2) is not clear and unambiguous in context.  (See *Smith*, *supra*, 39 Cal.4th at p. 83.)  Former section 3000.1, subdivision (a)(2) listed a number of sex offenses that are subject to life terms, for which lifetime parole was required.  Section 269 and section 288.7 are both offenses that are punishable by life terms.  Thus, in context, the word "and" could mean

20

that someone convicted of section 269 *and* someone convicted of section 288.7 *each* would be subject to lifetime parole, or it could mean that someone convicted of violating *both* section 269 *and* section 288.7 would be subject to lifetime parole.  Therefore, we turn to the legislative history.

Prior to 2010, former section 3000.1 provided for a lifetime parole period only "[i]n the case of any inmate sentenced under Section 1168 for any offense of first or second degree murder . . . ."  (Stats. 2001, ch. 854, § 50.)

In 2010, the Legislature amended former section 3000.1 as part of "Chelsea's Law" which increased penalties for various sex crimes against minors.  (See *People v. Soto* (2011) 51 Cal.4th 229, 237, fn. 4.)  An early analysis of the proposed legislation stated:  "This bill increases parole to lifetime parole for the following offenses:  . . . sexual intercourse; oral copulation; or sodomy with a child 10 years of age or younger [§ 288.7 violators]; . . . aggravated sexual assault of a child [§ 269 violators] . . . ." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1844 (2009-2010 Reg. Sess.) as amended Apr. 13, 2010, p. 23.)

As amended on July 15, 2010, the proposed legislation would have enacted a lifetime parole requirement on "any inmate sentenced to a life term under Section 269, subdivision (c) of Section 667.51, Section 667.71 in which one or more of the victims of the offense was a child under 14 years of age, or subdivision (j), (l), or (m) of Section 667.61."  (Assem. Bill No. 1844 (2009-2010 Reg. Sess.) as amended July 15, 2010, § 19.)

Further amendments were made to the proposed legislation, including the addition of specific references to section 288.7.  However, the Legislative Counsel's digest still stated that the bill would require lifetime parole for "habitual sex offenders, persons convicted of kidnapping a child under 14 years of age with the intent to commit a specified sexual offense, and persons convicted of other specified sex crimes, including

21

among others, aggravated sexual assault of a child." (Assem. Bill No. 1844 (2009-2010 Reg. Sess.) as amended Aug. 2, 2010.) There was no statement that lifetime parole would be mandated for persons convicted of aggravated sexual assault of a child (§ 269) only if the person had been convicted of section 288.7.

Effective January 1, 2015, section 3000.1 was amended to replace "and" with "or" and now states that the lifetime parole requirement applies to persons convicted of either section 269 or section 288.7. (Stats. 2014, ch. 280, § 2.) One committee report on the proposed amendment refers to *People v. Tirey*, review granted August 20, 2014, S219050 (*Tirey II*),[7] which "interpreted Section 3000.1 so as to only require lifetime parole for a person convicted under both Section 269 and 288.[7], not one section alone." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1438 (2013-2014 Reg. Sess.) as amended June 3, 2014.) The report further discloses that the Legislature considered the prior version of section 3000.1 to have been unintentional, that is, "the conjunctive 'and' between 269 and 288.7 appears to have been an error or oversight." (Sen. Com. on

---

[7] *People v. Tirey* (Nov. 15, 2013, G048369) (rehearing granted Dec. 11, 2013) (*Tirey I*) concluded that the defendant was eligible to apply for a certificate of rehabilitation pursuant to section 4852.01. After rehearing, a majority in *Tirey II* reached the same conclusion. *Tirey II* held that section 4852.01 violated the defendant's right to equal protection, because the statute barred those convicted of section 288, subdivision (a) from petitioning for a certificate of rehabilitation, but allowed those convicted of more serious crimes under section 288.7 to file such a petition. In reaching this conclusion, *Tirey II* rejected the Attorney General's argument that those convicted of section 288.7 are barred from seeking a certificate of rehabilitation. The Attorney General asserted that former section 3000.1 imposed a mandatory lifetime parole requirement on those convicted of section 288.7, and thus these individuals were also subject to the prohibition of section 4852.01. In determining whether the defendant was deprived of equal protection, *Tirey II* interpreted former section 3000.1 and concluded that the statute applied to those persons convicted of both section 269 and section 288.7. The California Supreme Court granted the Attorney General's petition for review and transferred the case back to the Court of Appeal for reconsideration. *People v. Tirey* (2015) 242 Cal.App.4th 1255 (*Tirey III*) recognized that the amendment to section 3000.1 clarified that the defendant was not treated differently from those similarly situated and thus, the court did not consider his equal protection claim. (*Tirey III*, at p. 1263.)

Public Safety, Analysis of Assem. Bill No. 1438 (2013-2014 Reg. Sess.) as amended June 3, 2014.)

Based on this legislative history, we conclude that the Legislature intended that the lifetime parole requirement would apply to those individuals convicted of either section 269 or section 288.7. There is simply nothing in the legislative history indicating that the Legislature intended that the lifetime parole requirement applied only to those individuals who were convicted of both section 269 and section 288.7. Moreover, " ' " " '[a]n amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act, where the amendment was adopted soon after the controversy arose concerning the proper interpretation of the statute. . . .' [Citation.]" ' [Citation.]" (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 923.) Thus, the legislative amendment further indicates that the Legislature intended to require lifetime parole of persons convicted of violating either section 269 or section 288.7. Accordingly, the judgment must be modified.

### III. Disposition

The judgment is modified to reflect a lifetime parole period. As modified, the judgment is affirmed.

_____

Mihara, J.

WE CONCUR:

_____

Elia, Acting P. J.

_____

Bamattre-Manoukian, J.