Filed 7/20/22  P. v. Sepulveda CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>AARON EUGENE SEPULVEDA,<br><br>    Defendant and Appellant. | H049107<br>(Monterey County<br>Super. Ct. No. 18CR008296) |

## I.  INTRODUCTION

Defendant Aaron Eugene Sepulveda was convicted by jury of the following 12 counts: aggravated sexual assault of a child under the age of 14 by rape (Pen. Code, §§ 269, subd. (a)(1), 261, subd. (a)(2);)[1]; forcible rape of a child under the age of 14 (§ 261, subd. (a)(2)); two counts of forcible lewd act on a child under the age of 14 (§ 288, subd. (b)(1)); sexual intercourse with a child aged 10 or younger (§ 288.7, subd. (a)); three counts of lewd act on a child under the age of 14 (section 288, subd. (a)); sodomy with a child aged 10 or younger (§ 288.7, subd. (a)); aggravated sexual assault of a child under the age of 14 by forcible oral copulation (§ 269, subd. (a)(4); former § 288a, subd. (c)(2)); and two counts of oral copulation with a child aged 10 or younger (§ 288.7, subd. (b)).  The jury found true allegations that defendant personally inflicted great

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

bodily injury (§ 12022.8) and personally inflicted bodily harm upon a child under the age of 14 (§ 667.61, subds. (d)(7) & (j)(1)) regarding the counts for aggravated sexual assault of a child under the age of 14 by rape, forcible rape of a child under the age of 14, and one of the counts for forcible lewd act on a child under the age of 14.  The jury also found true the allegation that defendant personally inflicted bodily harm (§ 288, subd. (i)) regarding one of the counts for lewd act on a child under the age of 14.  The trial court sentenced defendant to prison for life without the possibility of parole, consecutive to 55 years to life, consecutive to eight years.

On appeal, defendant contends that (1) his trial counsel rendered ineffective assistance of counsel by failing to object at trial to a defense expert's testimony on cross-examination, (2) the trial court erred in admitting child sexual abuse accommodation syndrome (CSAAS) evidence by the prosecution, (3) the court erred by using CALCRIM No. 1193 to instruct the jury regarding the permissible use of CSAAS evidence, (4) the court erred by failing to stay the sentence on either count 8 (aggravated sexual assault of a child under the age of 14 by forcible oral copulation) or count 12 (oral copulation with a child aged 10 or younger), (5) the matter should be remanded for resentencing so that the court may exercise its discretion under recently amended section 654 to determine which counts to stay, and (6) the matter should be remanded for the court to correct its sentence on count 9 (forcible lewd act on a child under the age of 14) to an eight-year middle term.  The Attorney General concedes the latter two issues.

For reasons that we will explain, we will reverse the judgment and remand the matter for resentencing for the trial court to apply the amended version of section 654, to correct the sentence on count 9 by selecting the eight-year middle term (§ 288, subd. (b)(1)), and to correct any errors in the abstract of judgment.

2

## II. BACKGROUND

### A. *Defendant's Sexual Abuse of a Child*[2]

At the time of trial in 2021, Jane Doe was a few months shy of 12 years old and defendant turned 35 years old later that year. During the relevant time, Doe lived with her grandmother, mother, younger brother, and defendant, whom Doe assumed was her biological father although he was in fact her stepfather.

Doe indicated that defendant repeatedly sexually abused her. She testified that the abuse included defendant making her lick or suck his penis and swallow the white "liquid" that came out, having her lick his "butt" on the "cheek" and around the "butt hole," putting his penis in her vagina, and putting his penis in her "butt" where the "poop comes out."

The final incident of sexual abuse occurred in 2018, when Doe was nine years old, and resulted in her requiring hospitalization due to bleeding from her vagina. During the encounter in Doe's bedroom, defendant repeatedly put his penis in Doe's vagina. It "really hurt" Doe, and she unsuccessfully tried to "wiggle free" more than once. Defendant hit Doe more than once and asked if she "wanted to die" before putting his penis in her again. He also put his penis in her mouth and in her "butt." After defendant saw that she was bleeding, he put his tongue on her vagina.

Defendant and Doe's mother took Doe to the hospital a few days later. By that time, Doe's mother observed that Doe had passed a lot of blood and was pale and shaky. At the direction of defendant, Doe initially lied and told the police at the hospital that she caused the injury herself by using her mother's dildo. Doe eventually disclosed that defendant had caused the injury.

---

[2] We provide only a general summary of the evidence admitted at trial because defendant's contentions on appeal are primarily limited to the CSAAS evidence and to sentencing issues.

The emergency room doctor testified that Doe suffered "a severe life-threatening injury" and needed a blood transfusion due to the amount of blood loss. She was taken to the operating room, and it was determined that she required sutures. The treating urogynecologist, a doctor who specializes in female reconstructive surgery, testified that Doe's injury was "very significant" and that he had seen that type of injury in women "[o]nly after childbirth." Due to the severity of her injuries, Doe had to stay in the hospital for a period of time. She also had to go to the operating room again a couple of months later so that the urogynecologist could check and make sure her injuries had healed. At that time, "[t]here was still some scar tissue present at the back part of the vagina."

**B.** *The CSAAS Evidence*

Dr. Anthony Urquiza testified as an expert witness for the prosecution. He was a licensed psychologist, professor, and the director of Care Center, a child abuse treatment program. He had spoken to or worked with more than 1,000 child sexual abuse victims, and he had conducted research for 40 years mostly related to child abuse.

Dr. Urquiza testified about common characteristics of children who have been sexually abused, including that most children delay their disclosure of the abuse, that children commonly stay with their abuser with whom they may have an ongoing relationship, that children usually do not effectively prevent themselves from being sexually victimized, and that children are often not clear and accurate about every instance of abuse when it lasts over a period of time. Dr. Urquiza indicated that the forensic interview process is "designed . . . to get a child to talk in a way that is not leading, that is following up on statements that they have previously made," which "often leads to them being able to talk more explicitly or more fully about things that have previously occurred."

Dr. Urquiza also testified that he was familiar with CSAAS and its five "characteristics" of secrecy, helplessness, entrapment and accommodation, delayed and

4

unconvincing disclosure, and retraction and recantation. He explained that the purpose of CSAAS was "not to make a determination as to whether somebody's abused or not. Its purpose is to educate people about sexual abuse. How do children respond to being sexually abused so that if you're a therapist, you could do a better job of treating, or if you're a member of a jury, that you can hear the evidence that's put before you and then render an opinion without any misperception or myth related to sexual abuse." Dr. Urquiza repeatedly testified that CSAAS cannot be used to determine whether a child has been sexually abused.

Dr. William O'Donohue testified on behalf of the defense as an expert in child sexual abuse, forensic interviewing of alleged victims of child abuse, and CSAAS. He was a Nevada-licensed psychologist, a professor of clinical psychology, and the director of Victims of Crime Treatment Center, which provided therapy to children and adults who have been sexually abused. Dr. O'Donohue testified that no single study had looked at all five major elements of CSAAS and that there were studies that refuted some of the elements. He also testified that research showed that when certain interview techniques are used with children, there is the potential that the narrative provided by the children is unreliable.

## C. *The Charges, Verdicts, and Sentencing*

Defendant was charged by first amended information with the following 14 counts: aggravated sexual assault of a child under the age of 14 by rape (§§ 269, subd. (a)(1), 261, subd. (a)(2); count 1); forcible rape of a child under the age of 14 (§ 261, subd. (a)(2); count 2); four counts of forcible lewd act on a child under the age of 14 (§ 288, subd. (b)(1); counts 3, 6, 9 & 11); sexual intercourse with a child aged 10 or younger (§ 288.7, subd. (a); count 4); three counts of lewd act on a child under the age of 14 (section 288, subd. (a); counts 5, 13 & 14); sodomy with a child aged 10 or younger (§ 288.7, subd. (a); count 7); aggravated sexual assault of a child under the age of 14 by forcible oral copulation (§ 269, subd. (a)(4); former § 288a, subd. (c)(2); count 8); and

5

two counts of oral copulation with a child aged 10 or younger (§ 288.7, subd. (b); counts 10 & 12). The information also alleged that defendant inflicted great bodily injury (§ 12022.8) as to counts 1, 2, and 3; that he personally inflicted bodily harm on a child under the age of 14 (§ 667.61, subds. (d)(7) & (j)(1)) as to counts 1, 2, and 3; and that he personally inflicted bodily harm (§ 288, subd. (i)) as to count 5.

The jury found defendant guilty on all counts, except counts 6 and 11 (forcible lewd act on a child under the age of 14; § 288, subd.(b)(1)), and found all allegations true.

At sentencing, the trial court referred to defendant's conduct as "egregious, one of the worst [the trial court] ha[d] seen in 30 years in the criminal justice field." The court sentenced defendant to prison for life without the possibility of parole, consecutive to 55 years to life, consecutive to eight years. The sentence was calculated as follows: life without the possibility of parole on count 2, a consecutive term of 25 years to life on count 7, a consecutive term of 15 years to life on count 8, a consecutive term of 15 years to life on count 12, a consecutive term of six years on count 13, and a consecutive term of 2 years on count 14. Pursuant to former section 654, the court stayed the punishment on the following counts: life without the possibility of parole on counts 1 and 3, 25 years to life on count 4, seven years to life on count 5, nine years on count 9, and 15 years to life on count 10.

## III. DISCUSSION

### A. *Failure to Object to Defense Expert Testimony on Cross-Examination*

On appeal, defendant contends that his trial counsel rendered ineffective assistance of counsel by failing to object to the testimony of Dr. O'Donohue, the defense expert, on cross-examination that "[t]he majority of child sexual abuse accusations have been true."

The Attorney General contends that defendant cannot show deficient performance by trial counsel or prejudice.

### 1. Trial Court Proceedings

As we set forth above, Dr. O'Donohue testified as a defense expert in child sexual abuse, forensic interviewing of alleged victims of child abuse, and CSAAS. Among other positions that he held, Dr. O'Donohue was the director of Victims of Crime Treatment Center. The treatment center was a "grant-funded treatment facility" that provided therapy to children and adults who have been sexually abused. Dr. O'Donohue estimated that during his career at the treatment center, he had assessed and treated approximately 2,000 children who had been sexually abused.

Dr. O'Donohue testified on direct examination that when certain interview techniques are used with children, there is the potential that the narrative provided by the child is unreliable. The interview techniques that create the risk of an unreliable narrative include the use of close-ended questions, leading questions, repetitive questions, disconfirming a child's responses or otherwise reacting to certain answers differently than other answers, and emotional tone changes by the interviewer depending on what the child says. Dr. O'Donohue also testified that "authority pleasing," meaning the interest of a child to tell the adult interviewer what the interviewer wants to hear instead of what actually happened, and interviewer bias, where the interviewer asks questions and forms conclusions in a way to meet the interviewer's own expectations, are also risk factors that have the potential to result in an unreliable narrative by a child who is being interviewed.

On cross-examination, Dr. O'Donohue testified that the treatment center where he works does not conduct forensic interviewing or otherwise investigate a child's allegations of sexual abuse for legal purposes, but that the treatment center does investigate or gather information for diagnostic and therapy purposes. He explained that the funding grant for the treatment center required that resources be used for people who have been victims of crime. If a person was not a victim of a crime, then the treatment center "cannot treat them" but could send the person to another clinic for treatment.

The prosecutor then asked Dr. O'Donohue the following questions:

7

"[The prosecutor:]  And how often has this happened?

"[Dr. O'Donohue:]  Oh, not very often.  It might occur four or five times in a year.

"[The prosecutor:]  So out of the 2,000 that -- I think that's the number you gave on direct examination.  The majority of those have been true?

"[Dr. O'Donohue:]  Yes.  The majority of child sexual abuse accusations have been true."

The prosecutor thereafter continued to ask Dr. O'Donohue questions about his prior work and experience, before turning to the topics of the purpose and origination of CSAAS, types of interviewer questions and the reliability of children's responses, and common reactions by sexually abused children.

## 2.  Analysis

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating . . . that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.]  . . .  If a defendant meets the burden  . . . , he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [Citation.]'  [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*).)

The California Supreme Court has "often observed" that "whether or not to object to evidence at trial is largely a tactical question for counsel, and a case in which the mere failure to object would rise to such a level as to implicate one's state and federal constitutional right to the effective assistance of counsel would be an unusual one. [Citation.]  An attorney may well have a reasonable tactical reason for declining to object, and ' "[i]f the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or

there simply could be no satisfactory explanation." ' [Citation.] (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1312-1313 (*Seumanu*).)

A possible tactical reason for counsel to refrain from objecting may be counsel's "desire[] not to highlight the evidence by making an objection. '[T]he decision whether to object, move to strike, or seek admonition regarding [undesired] testimony is highly tactical, and depends upon counsel's evaluation of the gravity of the problem *and whether objection or other responses would serve only to highlight the undesirable testimony*.' [Citation.]" (*Seumanu*, *supra*, 61 Cal.4th at p. 1313.)

In this case, defendant contends that the testimony by his expert, Dr. O'Donohue—that "[t]he majority of child sexual abuse accusations have been true"—amounted to testimony that greater than 50 percent of child sexual abuse allegations are true. According to defendant, Dr. O'Donohue's testimony " 'invited jurors to presume [defendant] was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case,' " quoting *People v. Julian* (2019) 34 Cal.App.5th 878, 886 (*Julian*). Defendant also cites *People v. Wilson* (2019) 33 Cal.App.5th 559 (*Wilson*) and *People v. Lapenias* (2021) 67 Cal.App.5th 162 (*Lapenias*) in support of his argument that testimony regarding the rarity of false sexual abuse allegations is improper and that his trial counsel should have objected to the testimony.

In *Julian*, the appellate court determined that statistical evidence presented by the prosecution's expert witness went beyond the permissible scope of CSAAS evidence and that defense counsel provided ineffective assistance by not objecting to it. (*Julian*, *supra*, 34 Cal.App.5th at p. 880.) The expert made more than 10 statements referring to the small percentage or rarity of false reports of abuse based on various studies or articles. (*Id.* at pp. 883-885.) The statistics included testimony that false allegations of sexual abuse by children " 'don't happen very often,' " and that " '[t]he range of false allegations that are known to law enforcement or [Child Protective Services] . . . is about as low as one percent of cases to a high of maybe 6, 7, 8 percent of cases that appear to

9

be false allegations.' " (*Id.* at pp. 883, 885, italics omitted.)  The appellate court found that the expert's "92 to 99 percent probability evidence invited jurors to presume [the defendant] was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case." (*Id.* at p. 886.)  In determining that the defendant's trial counsel rendered ineffective assistance of counsel, the appellate court found that there was "no justification for counsel's failure to object to [the expert's] statistical evidence on false allegations.  It was inadmissible and it improperly suggested [the defendant] was guilty based on statistical probabilities that were irrelevant to this case." (*Id.* at p. 888.)  Further, the evidence was "highly prejudicial" because there was a "credibility dispute between [the victim's] testimony and [the defendant's]" and "[i]t was a heavily contested case with strong defense evidence." (*Ibid.*)  The court stated, however, that statistical evidence "may not be prejudicial where it occurs in a slight passing reference by the expert.  But here the jury was bombarded with it." (*Ibid.*)

In *Wilson*, *supra*, 33 Cal.App.5th 559, the appellate court concluded that expert testimony that only a small percentage of child sexual abuse allegations are false should not have been admitted, but that the error was harmless.  (*Id.* at pp. 561, 572.)  The expert's testimony included statements that false allegations occurred " 'very infrequently or rarely' " and that studies showed false allegations in 1 to 6 percent of cases.  (*Id.* at p. 568.)  The appellate court found that the testimony "had the effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth." (*Id.* at p. 570.)  The appellate court determined that "the practical result was to suggest to the jury that there was an overwhelming likelihood [the victims'] testimony was truthful," which "invaded the province of the jury." (*Ibid.*)  The appellate court ultimately concluded that the error in admitting the evidence was harmless under *People v. Watson* (1956) 46 Cal.2d 818.  (*Wilson*, *supra*, at pp. 571-572.)  Among other reasons, the appellate court explained that the expert's testimony on the statistical evidence was "brief"; the defense rebutted the evidence; the

10

prosecutor did not mention the statistical evidence in argument; the jury was instructed that it was the sole judge of the facts and of witness credibility; and the victims testified extensively and the jurors could assess their credibility. (*Id.* at p. 572.)

In *Lapenias*, *supra*, 67 Cal.App.5th 162, the appellate court determined that the trial court erred in allowing the CSAAS expert to testify that it is " 'rare' " for children to make up a story that abuse occurred," but that the error was harmless (*Id.* at p. 166; see also *id.* at pp. 177, 180.) The appellate court found that the testimony "went considerably beyond the limited purpose of CSAAS evidence (to explain the typical behaviors of sexually abused children, such as delayed reporting)" and—"by implication and by inference—violated the general rule that an expert may not give an opinion as to whether another witness is telling the truth or the defendant is guilty." (*Id.* at p. 179.) The appellate court determined that there was " 'no meaningful distinction between giving a statistic that indicates that false allegations are rare and stating that children rarely make false allegations without explicitly quantifying the word "rare." The problem with both assertions is that [the] expert is vouching for the veracity of the' alleged victims." (*Id.* at pp. 179-180.) The appellate court nevertheless found the error harmless. (*Id.* at p. 180 [applying *Watson* test].) The appellate court reasoned that the expert's testimony was "brief" as were the references to the testimony by both counsel during argument; there was persuasive corroborative evidence of the defendant's guilt; and the jury was instructed regarding the limited purpose of CSAAS evidence, that they were not bound by an expert's opinion, and that they were the sole judge of witness credibility. (*Id.* at p. 180.)

In this case, assuming that an objection would have been sustained to Dr. O'Donohue's testimony that "[t]he majority of child sexual abuse accusations have been true" (and that the testimony would have been stricken), we determine that a plausible reason exists for trial counsel's failure to object. The testimony was limited to one sentence by Dr. O'Donohue during the prosecutor's cross-examination into

11

Dr. O'Donohue's background and experience, and specifically in the context of grant funding restrictions for the treatment center that was overseen by Dr. O'Donohue. Given the brevity of the testimony about the majority of abuse accusations being true, and the context in which the testimony was made regarding Dr. O'Donohue's background, defendant's trial counsel may well have determined that an objection (accompanied by a motion to strike) would serve only to highlight the brief testimony that the jurors might otherwise not give much attention to. (See *Seumanu*, *supra*, 61 Cal.4th at p. 1313.) This case is therefore distinguishable from *Julian*, where the "jury was bombarded with" more than 10 statements by the prosecution's expert about the rarity of false reports of abuse and the appellate court found "no justification for counsel's failure to object." (*Julian*, *supra*, 34 Cal.App.5th at pp. 888, 883-885; see also *id.*, at p. 888 [the "evidence may not be prejudicial where it occurs in a slight passing reference by the expert"].) Instead, this case is analogous to *Wilson* and to *Lapenias*, where the expert's testimony was extremely "brief." (*Wilson*, *supra*, 33 Cal.App.5th at p. 572; *Lapenias*, *supra*, 67 Cal.App.5th at p. 180.) Indeed, Dr. O'Donohue's statement was limited to one sentence in the context of a discussion about his background and experience. Accordingly, "[t]here being a plausible reason why counsel did not object, we cannot conclude on this record that counsel's inaction lacked a reasonable tactical basis." (*Seumanu*, *supra*, at p. 1313.)

### B. *Admission of CSAAS Evidence*

Defendant contends that the trial court erred in admitting CSAAS evidence by the prosecution. First, he argues that the evidence, even with its limited admission, was irrelevant and not sufficiently beyond common experience to warrant expert opinion. Second, defendant contends that the CSAAS evidence should have been excluded because it does not meet the reliability test in *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*). Third, he argues that the CSAAS evidence should have been excluded under Evidence Code section 352. Fourth, defendant contends that his constitutional rights to due process were violated because the admission of CSAAS evidence rendered his trial

12

fundamentally unfair. To the extent his trial counsel failed to object on any of these grounds, we understand defendant to contend that his counsel rendered ineffective assistance of counsel.

### 1. Trial Court Proceedings

Prior to trial, the prosecutor filed a motion in limine to admit expert testimony regarding CSAAS to address misconceptions about sexually abused children and to assist the jury in evaluating the victim's testimony. Specifically, the prosecutor sought to admit expert testimony regarding child victims' lack of timely reporting of sexual abuse, keeping the abuse a secret, willingness to remain in the same house as the abuser, inability to recall exact dates of abuse, lying to protect the abuser, disclosure of more details in subsequent interviews, and inability to describe the abuse to a jury in the same detail as previously disclosed.

At the same time, defendant filed a pretrial motion to exclude CSAAS expert testimony. He "object[ed] because CSAAS is not reliable, because it is a therapeutic tool not a forensic tool, because it unjustly vouches for the credibility [of] the complaining witness, and because it is unduly prejudicial." He also contended that "CSAAS does not pass the 'Kelly-Frye' test and cannot be admitted to establish that a case fits the CSAAS construct." Defendant acknowledged that under California caselaw, CSAAS evidence was admissible for the limited purpose of dispelling juror misconceptions about how a child reacts to molestation, as long as the victim's credibility was at issue due to the "paradoxical behavior of the victim, such as a delay in reporting a molestation." He contended, however, that even with a limiting instruction, the jury would use CSAAS as evidence that he committed the alleged molestations. Defendant argued that the evidence should be excluded under Evidence Code section 352, and that allowing CSAAS evidence would violate his due process rights.

At a pretrial hearing on the motions, the trial court stated that its "tentative ruling" was to allow CSAAS expert testimony "limited to the common characteristics of child

13

sexual abuse victims" for the "limited purpose of showing whether or not Jane Doe's conduct was not consistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." The court further ruled that the testimony could not be "considered evidence that the defendant committed any of the crimes charged," and that neither party could argue that "Jane Doe had or did not have particular behaviors; and, therefore, the charge and allegations are true or not true."

## 2. Analysis

### a. *Relevance of CSAAS expert testimony*

#### i. whether CSAAS expert testimony was relevant to Doe's delayed disclosure

First, defendant contends that CSAAS evidence was "irrelevant to explaining Doe's delay in reporting" her claims of sexual abuse because she herself explained the delay. Citing to an interview of Doe by the police, defendant argues that Doe "specifically testified" that defendant told her to keep it a secret and that she would get in trouble if she told anyone. Second, in a related argument, defendant contends that "Doe's remaining silent about the allegations on account of [defendant's] threats did not require any expert testimony to explain. Because a person's remaining silent about wrongful conduct on account of a threat is not 'sufficiently beyond common experience' to justify the use of an expert opinion (Evid. Code, § 801, subd. (a)), the evidence should have been excluded."

It does not appear that defendant has preserved these claims for appeal. Defendant does not provide a record citation showing that he made a pretrial relevance objection to CSAAS evidence regarding delayed reporting on the ground that Doe would be explaining her own delay in reporting. Further, " '[t]he general rule is that "when an in limine ruling that evidence is admissible has been made, the party seeking exclusion must object *at such time as the evidence is actually offered* to preserve the issue for appeal . . . ." ' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 159, italics added &

14

omitted.)  In other words, a defendant is "required to renew [the] objection at trial, when the trial court would have the opportunity to evaluate [the] objection[] in light of the actual evidence presented.  [Citation.]"  (*Ibid.*)  In this case, the trial court told the parties that its pretrial ruling regarding the admissibility of CSAAS evidence was a "tentative ruling," and that "all [i]n [l]imine rulings are tentative rulings based upon what I know now.  They can . . . always be revisited outside the presence of the jury for further argument."  On appeal, defendant only refers to the court's pretrial tentative ruling and does not include a record citation showing that he asked the court to revisit its earlier tentative ruling in view of the evidence actually admitted at trial regarding Doe's explanation for the delay in reporting.  Defendant therefore fails to establish that he preserved his relevancy objections for appeal.

We understand defendant to contend that, to the extent his claim is forfeited, his trial counsel rendered ineffective assistance.  We therefore turn to the substance of defendant's contentions.  (See *Lopez*, *supra*, 42 Cal.4th at p. 966 [ineffective assistance of counsel claim requires showing deficient performance and prejudice]).

Only relevant evidence is admissible.  (Evid. Code, § 350.)  " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (*Id.*, § 210.)  In this case, the issue of Doe's delayed disclosure about defendant's abuse was pertinent to her credibility.  The fact that Doe herself may have offered an explanation as to why she delayed reporting the abuse did not make the CSAAS evidence regarding delayed disclosure any less relevant.  As CSAAS evidence regarding delayed disclosure was evidence "relevant to the credibility" of Doe (*id.*, § 210), defendant cannot show ineffective assistance of counsel based on his trial counsel's failure to object to the evidence.

We also reject defendant's contention that Doe's own explanation about her delayed report of abuse rendered irrelevant CSAAS expert testimony about delayed

disclosure. Expert opinion testimony is admissible when the opinion is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) " 'The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men [or women] of ordinary education could reach a conclusion as intelligently as the witness." ' [Citation.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300 (*McAlpin*).) Although a jury might have sufficient common experience regarding the general concept of delayed disclosure due to a threat of harm, it is not necessarily the case that a jury would have sufficient common experience in a situation involving delayed disclosure of *sexual abuse*. Given the " 'commonly held misconceptions' " about sexual abuse victims, including regarding delayed reporting (*McAlpin*, *supra*, at p. 1301; see *id.* at p. 1300), the trial court could reasonably conclude that expert testimony regarding delayed disclosure would "assist" the jury (Evid. Code, § 801, subd. (a)), even if the jury was not "wholly ignorant" of the subject matter. (*McAlpin*, *supra*, at p. 1299; see *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 (*Patino*) [CSAAS testimony "admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation"].) As it was not an abuse of discretion for the trial court to admit the evidence, defendant cannot show ineffective assistance of counsel based on his trial counsel's failure to object on the ground raised here. (See *McAlpin*, *supra*, at p. 1299 [admission of expert testimony analyzed under abuse of discretion standard]; *Lopez*, *supra*, 42 Cal.4th at p. 966 [ineffective assistance of counsel claim requires a showing of deficient performance and prejudice].)

16

### ii. whether CSAAS evidence was relevant to determining whether abuse occurred

Next, defendant contends that, because the prosecutor's expert, Dr. Urquiza, "conceded that the CSAAS model is not useful for determining whether abuse has occurred," "the testimony lacked 'any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.)" We are not persuaded by defendant's argument. The record reflects that the trial court admitted CSAAS expert testimony for the "limited purpose of . . . evaluating the believability of [the victim's] testimony." The court expressly stated that the testimony could not be "considered evidence that the defendant committed any of the crimes charged," and that neither party could argue that "Jane Doe had or did not have particular behaviors; and, therefore, the charge and allegations are true or not true." Because the evidence was admitted for evaluating the victim's credibility and *not* "for determining whether abuse has occurred," we do not consider defendant's relevancy contention on the latter point any further.

### iii. whether CSAAS evidence was relevant when the evidence depends on an assumption that abuse occurred

Defendant contends that "[s]everal of the behaviors that CSAAS describes as consistent with a child's being the victim of sexual abuse," such as delayed disclosure or secrecy, "only qualify as such behaviors when it is assumed that the sexual abuse occurred." He argues, that "[t]hus, under CSAAS, specific behavior can be consistent with a child's having been sexually abused, but the finding that the specific behavior exists already depends on assuming the believability of the victim. This circular reasoning thus lacks 'any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.)"

We find defendant's argument unpersuasive in establishing that the trial court erred in admitting CSAAS evidence. As the California Supreme Court has explained in

17

the analogous context of the rape trauma syndrome, expert testimony about the syndrome "may play a particularly useful role by disabusing the jury of some widely held misconceptions about [abuse] and [abuse] victims, so that it may evaluate the evidence free of the constraints of popular myths. [Citations.]" (*People v. Bledsoe* (1984) 36 Cal.3d 236, 247-248 (*Bledsoe*), fn. omitted; see *Lapenias*, *supra*, 67 Cal.App.5th at p. 171 [a court "may admit CSAAS evidence to disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse"].) Thus, CSAAS evidence was admitted in this case to "evaluat[e] the believability of [Doe's] testimony," and it was not premised on an assumption, nor was it admitted to prove, that she had been abused.

### iv. whether the prosecutor had the burden to prove current public misconceptions about child abuse victims

Citing *McAlpin*, *supra*, 53 Cal.3d 1289, defendant acknowledges that "[o]ur Supreme Court . . . held in 1991 that CSAAS testimony is necessary to rebut public misconceptions." He contends, however, that *McAlpin* and other appellate court opinions "from the early 1990s are no longer an accurate reflection of current understandings of how children respond to abuse." He argues that the prosecutor in this case had the burden of showing the continued existence of public misconceptions as part of the burden of establishing the relevance of CSAAS evidence, and that the defense did not have the burden of demonstrating that the misconceptions are no longer present.

As an initial matter, defendant fails to provide a record citation establishing that he objected to the CSAAS evidence on the basis that the public no longer has misconceptions about child abuse. We therefore determine that defendant has forfeited his claim.

To the extent defendant contends that his trial counsel rendered ineffective assistance by failing to make the objection below, defendant fails to establish deficient performance or prejudice. (See *Lopez*, *supra*, 42 Cal.4th at p. 966.)

18

First, defendant fails to establish deficient performance by trial counsel, that is, a showing that an objection by counsel on this ground would not have been futile and would have been sustained by the court. In this regard, defendant does not cite any authority for the proposition that the prosecutor must establish the current state of public perception about child abuse victims before CSAAS testimony is admissible. "CSAAS testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation. [Citation.]" (*Patino*, *supra*, 26 Cal.App.4th at p. 1744.) However, "[i]dentifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation. [Citations.]" (*Id.* at pp. 1744-1745.) In the analogous context of a parent of an abused child, the California Supreme Court has observed that "[m]ost jurors, fortunately, have been spared the experience of being the parent of a sexually molested child. Lacking that experience, jurors can rely only on their intuition or on relevant evidence introduced at trial." (*McAlpin*, *supra*, 53 Cal.3d 1289 at p. 1302.) Expert opinion testimony is permitted "to explain to lay jurors conduct that may appear counterintuitive in the absence of such insight. [Citations.]" (*People v. Ward* (2005) 36 Cal.4th 186, 211.) Indeed, " '[t]he jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission . . . . It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men [or women] of ordinary education could reach a conclusion as intelligently as the witness." ' [Citation.]" (*McAlpin*, *supra*, 53 Cal.3d at pp.1299-1300.) Given that CSAAS seeks to explain child abuse victims' behaviors that may appear counterintuitive, and given that the California Supreme Court has observed that most jurors lack personal experience with child molestation victims, we believe the trial court could have properly determined that

19

CSAAS evidence was admissible even in the absence of a showing by the prosecutor regarding the current state of public perception about child abuse victims.

Second, even if trial counsel rendered deficient performance by failing to object, defendant has not established that, had counsel objected, the prosecutor would have been unable to show the continued existence of misconceptions by the public and that the trial court would have accordingly excluded the CSAAS evidence. (See *Lapenias*, *supra*, 67 Cal.App.5th at pp. 172-173 ["while some prospective jurors . . . may have been aware of some aspects of CSAAS, it is not clear . . . all the empaneled jurors were aware of the entire spectrum of CSAAS evidence (secrecy, helplessness, entrapment, accommodation, and recantation)"].)

### b. *Whether CSAAS evidence is subject to the* Kelly *test*

Defendant next contends that all CSAAS evidence should be "subject to *Kelly/Frye* analysis because, in the over 35 years since the CSAAS model has been established, the model has not gained wide acceptance in the scientific community." He argues that "the fact that it has not gained wide acceptance renders the approach functionally equivalent to a 'novel' approach, for which the *Kelly-Frye* test should apply." Defendant contends that because "CSAAS evidence fails to satisfy *Kelly/Frye*'s standard of reliability," the trial court in this case abused its discretion in admitting the evidence.

Under the *Kelly* rule, which was formerly known as the *Kelly-Frye* rule,[3] "evidence obtained through a new scientific technique may be admitted only after its

---

[3] As explained by the California Supreme Court, "[u]ntil 1993, this rule was generally known in this state as the *Kelly-Frye* rule because this court in [*People v.*] *Kelly* [17 Cal.3d 24] had relied on the reasoning of a federal appellate court decision, *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 (*Frye*). In 1993, the United States Supreme Court held that the Federal Rules of Evidence had superseded *Frye* [citation], and our state law rule is now referred to simply as the *Kelly* test or rule. [Citation.]" (*People v. Bolden* (2002) 29 Cal.4th 515, 545 (*Bolden*); accord, *People v. Nieves* (2021) 11 Cal.5th 404, 442, fn. 8.)

reliability has been established under a three-pronged test.  The first prong requires proof that the technique is generally accepted as reliable in the relevant scientific community. [Citation.]" (*Bolden*, *supra*, 29 Cal.4th at p. 544.)

The California Supreme Court has explained that the "additional scrutiny" under *Kelly*, which "imposes certain preconditions on the admission of evidence derived from a novel scientific technique or procedure," " ' is justified because "[l]ay jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials.  We have acknowledged the existence of a ' . . . misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature.' " ' [Citations.]" (*People v. Peterson* (2020) 10 Cal.5th 409, 457 (*Peterson*).)

However, in contrast to evidence that is based on a new scientific technique or procedure, expert *opinion* testimony is not necessarily subject to *Kelly*.  The California Supreme has explained as follows:  "[I]n most cases no similar caution is required before a jury considers expert *opinion* testimony.  Unlike results 'produced by a machine,' to which jurors may 'ascribe an inordinately high degree of certainty,' jurors presented with the personal opinion of a witness, even an expert witness, 'may temper their acceptance of his [or her] testimony with a healthy skepticism born of their knowledge that all human beings are fallible.' [Citations.]  For this reason, ' "[a]bsent some special feature *which effectively blindsides the jury, expert opinion testimony is not subject to Kelly*[]." ' [Citations.]  Of course, some expert testimony may be 'based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law' [citation]; where the novel technique 'appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury,' additional scrutiny under *Kelly* is warranted.  [Citation.]" (*Peterson*, *supra*, 10 Cal.5th at pp. 457-458, some italics added.)

In the present case, defendant contends that the California Supreme Court applied *Kelly* to evidence regarding the rape trauma syndrome in *Bledsoe*, *supra*, Cal.3d 236.  In

*Bledsoe*, "expert testimony describing the [rape trauma] syndrome and applying it to [the] victim was used to prove that 'a rape in the legal sense had, in fact, occurred.' [Citation]" (*People v. Stoll* (1989) 49 Cal.3d 1136, 1160, italics omitted (*Stoll*).) However, the "rape trauma syndrome was not devised to determine . . . whether, in fact, a rape in the legal sense occurred -- but rather was developed by professional rape counselors as a therapeutic tool, to help identify, predict and treat emotional problems experienced by the counselors' clients or patients." (*Bledsoe*, *supra*, at pp. 249-250.) In other words, the scientific literature regarding rape trauma syndrome did "not . . . purport to claim that the syndrome is a scientifically reliable means of proving that a rape occurred." (*Id.* at p. 251.) Significantly, none of the parties in *Bledsoe* disputed that the *Kelly* test was the appropriate standard in evaluating the syndrome evidence. (*Stoll*, *supra*, at p. 1160.) As a result, the California Supreme Court "[a]ssum[ed], like the parties, that the [*Kelly*] test did apply," and "simply concluded that the prosecution would not be able to prove that rape trauma syndrome was generally accepted by the counseling community to prove criminal guilt." (*Id.* at p. 1161, italics omitted.) The California Supreme Court has subsequently made clear that its opinion in "*Bledsoe* did *not* hold that the [*Kelly*] test applied to the expert opinion in that case" and that *Bledsoe* did not "discuss the test's relationship to 'syndrome' or other expert psychological evidence in general." (*Stoll*, *supra*, 49 Cal.3d at p. 1161, fn. omitted, some italics added.)

Significantly, subsequent to *Bledsoe,* the California Supreme Court in *Stoll* concluded that where psychological testimony is based on methods that "are *not* new to psychology or the law" and "carry no misleading aura of scientific infallibility," the testimony is *not* subject to the *Kelly* rule. (*Stoll*, *supra*, 49 Cal.3d at p. 1157.)

In the present case, defendant fails to demonstrate that CSAAS evidence is based on methods that are "new to psychology or the law" and that testimony about CSAAS carries a "misleading aura of scientific infallibility." (*Stoll*, *supra*, 49 Cal.3d at p. 1157; accord, *Peterson*, *supra*, 10 Cal.5th at p. 458.) To the contrary, with respect to CSAAS

evidence, "we are not dealing with *new* experimental scientific evidence ' "not previously accepted in court." ' [Citations.]" (*People v. Munch* (2020) 52 Cal.App.5th 464, 472 (*Munch*).) In this case, the prosecution's expert, Dr. Urquiza, was a licensed psychologist, professor, and the director of Care Center, a child abuse treatment program. He had spoken to or worked with more than 1,000 child sexual abuse victims, and he had conducted research for 40 years mostly related to child abuse. Dr. Urquiza's expert testimony was thus " 'based on [his] clinical experience with child sexual abuse victims and on [his . . .] . . . familiarity with professional literature in the area.' [Citation.] . . . Such expert testimony meets 'traditional standards for competent expert opinion, without need for additional screening procedures' " under *Kelly*. (*Munch*, *supra*, at p. 473.) In addition, CSAAS evidence "has been ruled to be properly admitted by the courts of this state for decades. [Citations.]" (*Id.* at p. 472; see also *id*. at p. 468.)

Further, testimony about CSAAS does not purport to provide any " 'definitive truth' " (*Peterson*, *supra*, 10 Cal.5th at p. 458) about whether a child has been abused and instead simply attempts to rebut misconceptions about the conduct of child sexual abuse victims (see *Munch*, *supra*, 52 Cal.App.5th at pp. 468, 473; *Lapenias*, *supra*, 67 Cal.App.5th at p. 173). Indeed, in this case, Dr. Urquiza repeatedly testified that CSAAS cannot be used to determine whether a child has been sexually abused. He explained that CSAAS's "purpose is not to make a determination as to whether somebody's abused or not. Its purpose is to educate people about sexual abuse. How do children respond to being sexually abused so that . . . if you're a member of a jury, that you can hear the evidence that's put before you and then render an opinion without any misperception or myth related to sexual abuse." Further, the California Supreme Court has rejected the notion that the "use of 'syndrome' . . . terminology by a mental health professional makes the [testimony] seem 'scientific' to a jury, and thus invokes [*Kelly*]." (*Stoll*, *supra*, 49 Cal.3d at p. 1161, fn. 22 [court was "not persuaded that juries are incapable of evaluating properly presented references to psychological . . . 'syndromes' "].)

Lastly, in view of defendant's failure to demonstrate the *applicability* of the *Kelly* rule to the CSAAS evidence in this case, we find unpersuasive his reliance on out-of-state authority regarding whether CSAAS evidence meets a *Kelly* (or *Frye*) requirement regarding general acceptance within the scientific community. (See, e.g., *State v. J.L.G.* (N.J. 2018) 190 A.3d 442, 463 ["we apply the *Frye* test and consider whether CSAAS has achieved general acceptance in the scientific community"].)

Accordingly, because defendant fails to establish that CSAAS evidence is based on methods that are "new to psychology or the law" and that the evidence carried a "misleading aura of scientific infallibility" (*Stoll*, *supra*, 49 Cal.3d at p. 1157; accord, *Peterson*, *supra*, 10 Cal.5th at pp. 457-458), we conclude that the trial court did not abuse its discretion in admitting expert testimony about CSAAS without subjecting it to analysis under *Kelly*. (See, e.g., *Lapenias*, *supra*, 67 Cal.App.5th at p. 173 ["expert CSAAS testimony is not ' " 'scientific' " evidence' subject to the *Kelly* rule"]; *Munch*, *supra*, 52 Cal.App.5th at pp. 472-473 [CSAAS evidence not subject to *Kelly* analysis]; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449 (*Harlan*) [*Kelly* rule does not apply to expert testimony about the reactions of child molestation victims, where expert's "opinion was based on her clinical experience with child sexual abuse victims and on her familiarity with professional literature in the area"]; *People v. Gray* (1986) 187 Cal.App.3d 213, 218-220 [*Kelly* test not applicable to CSAAS testimony which addressed behavior of child molestation victims as a class, and which did not purport to prove molestation occurred]; see also *People v. Bowker* (1988) 203 Cal.App.3d 385, 392, fn. omitted (*Bowker*) [notwithstanding *Kelly*, CSAAS evidence may be admissible "for the limited purpose of disabusing the jury of misconceptions as to how child victims react to abuse"].)

### c. *Whether the CSAAS evidence was more prejudicial than probative*

Defendant contends that the CSAAS evidence should have been excluded under Evidence Code section 352 as unduly prejudicial and due to a "substantial danger of jury

confusion." In making this contention, he argues (1) that the CSAAS evidence lacked probative value, as set forth in his above-described arguments concerning the lack of relevance of the evidence, and (2) that the CSAAS "evidence was prejudicial," because "there was a strong likelihood the jury would misuse the CSAAS evidence as a diagnostic tool of Doe's having been sexually abused" and thus the CSAAS evidence "had the potential to improperly bolster her credibility." He argues that "[t]his danger" was "not lessened by the [jury] instruction which sets forth the proper use of such evidence."

Evidence Code section 352 provides that a "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

We find unpersuasive defendant's contention that the evidence should have been excluded under Evidence Code section 352. As we have explained, defendant's arguments that the CSAAS evidence lacked probative value and should have been excluded as irrelevant are without merit. CSAAS evidence has long been admissible in California to disabuse jurors of commonly held misconceptions about child sexual abuse. (See, e.g., *McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301, *Munch*, *supra*, 52 Cal.App.5th at p. 468; *Lapenias*, *supra*, 67 Cal.App.5th at p. 171; *Patino*, *supra*, 26 Cal.App.4th at pp. 1744-1745; *Harlan*, *supra*, 222 Cal.App.3d at pp. 449-450; *Bowker*, *supra*, 203 Cal.App.3d at pp. 393-394.) Regarding defendant's contention concerning undue prejudice and potential juror confusion about the proper use of CSAAS evidence, the jury in this case was instructed that testimony about CSAAS "is not evidence that the defendant committed any of the crimes charged against him" and that the jury "may consider this evidence only in deciding whether or not Jane Doe's conduct was not inconsistent with the conduct of someone who has been molested." (See CALCRIM No. 1193.) We must presume the jury followed this instruction. (See *People v. Cain*

25

(1995) 10 Cal.4th 1, 34.)  Defendant fails to show error under Evidence Code section 352 by the trial court.

### d. *Whether admission of CSAAS evidence violated due process*

Defendant contends that his state and federal constitutional rights to due process were violated because the admission of CSAAS evidence rendered his trial fundamentally unfair.  In this regard, he contends that (1) the CSAAS evidence was unreliable for the same reasons that he contended the *Kelly* test should apply, and (2) the CSAAS evidence should have been excluded as set forth in his above-described arguments concerning the lack of relevance of the evidence.  In his reply brief, defendant indicates that his due process argument is based on a contention that (3) " 'the . . . error in admitting the evidence over his Evidence Code section 352 objection had the additional legal consequence of violating due process.'  [Citation.]"

We have already rejected defendant's contentions that (1) CSAAS evidence is unreliable and that the *Kelly* test must be applied, (2) the evidence should have been excluded as irrelevant, and (3) the evidence should have been excluded under Evidence Code section 352 as unduly prejudicial and due to a substantial danger of jury confusion. The "rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised" on appeal.  (*People v. Scott* (2011) 52 Cal.4th 452, 487, fn. 29.)  We accordingly reject defendant's due process claim.

### C. *CALCRIM No. 1193*

Defendant contends that the trial court erred by using CALCRIM No. 1193, rather than CALJIC No. 10.64, to instruct the jury regarding the proper use of CSAAS evidence and that his constitutional rights to due process were violated as a result.  According to defendant, CALCRIM No. 1193 improperly states that the jury may consider CSAAS evidence "in evaluating the believability of [the victim's] testimony."  He argues that the "by instructing the jury that the CSAAS testimony may be used to assess credibility, it implies that the testimony, presented by the prosecution, may be used to *bolster*

credibility. The instruction allows the jury to find that, because a complaining witness's conduct after the fact was consistent with having been sexually abused, the complaining witness is more credible" and "therefore, that the complaining witness was in fact abused."

### 1. Trial Court Proceedings

Prior to trial, defendant requested that the trial court use CALJIC No. 10.64,[4] rather than CALCRIM No. 1193, to instruct the jury regarding the CSAAS evidence. He argued that the CALJIC instruction was "more complete and accurate" because it "reminds the jury that the research behind CSAAS begins with the assumption that a molestation has occurred." At a pretrial hearing on the motion, the trial court indicated that the CALCRIM instruction, not the former CALJIC instruction requested by defendant, would be used. The court explained that the CALCRIM instruction "sets forth the current state of the law."

At trial, the court instructed the jury pursuant to CALCRIM No. 1193 as follows: "You have heard testimony from Dr. Anthony Urquiza, regarding child sexual abuse accommodation syndrome. [¶] Dr. Urquiza's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes

---

[4] Defendant proposed the following instruction based on CALJIC No. 10.64:
" 'Evidence has been presented to you concerning child sexual abuse accommodation syndrome. This evidence is not received and must not be considered by you as proof that the alleged victim's molestation claim is true. [¶] Child sexual abuse accommodation syndrome research is based upon an approach that is completely different from that which you must take to this case. The syndrome research begins with the assumption that a molestation has occurred, and seeks to describe and explain common reactions of children to that experience. As distinguished from that research approach, you are to presume the defendant innocent. [¶] The People have the burden of proving guilt beyond a reasonable doubt. [¶] You should consider the evidence concerning child sexual abuse accommodation syndrome only for the limited purpose of showing, if it does, that the alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested.' "

27

charged against him. [¶] You may consider this evidence only in deciding whether or not Jane Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

Outside the presence of the jury, after the jury began deliberating, the trial court indicated that the parties and the court had conferenced several times regarding jury instructions. Defendant acknowledged by that point that he had "no objection" to CALCRIM No. 1193 "as given."

## 2. Analysis

Although defendant did not object to CALCRIM No. 1193 below on the same ground as he asserts on appeal, we nevertheless consider his appellate claim based on his contention that his substantial rights were affected by the erroneous instruction. (See § 1259.) When we review a purportedly erroneous instruction, we consider " ' " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1028 (*Richardson*).) We consider the instructions as a whole and " 'assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" (*Ibid*.)

We determine that it is not reasonably likely jurors understood CALCRIM No. 1193 as permitting the use of CSAAS evidence for the improper purpose of proving that Doe was abused by defendant. (See *Richardson*, *supra*, 43 Cal.4th at p. 1028.) CALCRIM No. 1193 informs jurors that they may use CSAAS evidence to evaluate whether the alleged victim's behavior, which may appear inconsistent with being molested, was actually not inconsistent. To the extent that CALCRIM No. 1193 allows jurors to consider CSAAS evidence in their evaluation of the victim's credibility, the instruction was proper because such evidence is relevant and admissible when an alleged victim's credibility has been attacked. (See *McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301.) Contrary to defendant's contention on appeal that jurors would interpret CALCRIM

28

No. 1193 as allowing them to conclude "that the complaining witness was in fact abused," CALCRIM No. 1193 specifically instructs jurors that they must not consider CSAAS testimony as evidence that the defendant committed the charged crimes. Accordingly, we conclude that defendant's claim regarding CALCRIM No. 1193 is without merit. (See *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503-504 [rejecting contention that CALCRIM No. 1193 allows a jury to use CSAAS testimony as proof that the victim was molested]; accord, *Munch*, *supra*, 52 Cal.App.5th at pp. 473-474; *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175-176.)

### D. *Cumulative Error*

Defendant contends that, "[s]hould this Court conclude none of the foregoing errors compel reversal of the judgment standing alone, the judgment should nevertheless be reversed pursuant to the cumulative error doctrine." As we have found no individual error, we reject defendant's cumulative error argument.

### E. *Application of Section 654 to Count 8 or 12*

Defendant contends that the trial court erred by failing to stay the sentence on either count 8, aggravated sexual assault of a child under the age of 14 by forcible oral copulation, or count 12, oral copulation with a child aged 10 or younger. Defendant argues that both counts were based on oral copulation that occurred on or between August 26, 2018, through August 27, 2018. According to defendant, Doe testified that she orally copulated defendant only once on the night of August 26. Defendant contends that the prosecutor, however, argued to the jury, and later to the court in connection with sentencing, that counts 8 and 12 were based on Doe orally copulating defendant twice during the encounter. Defendant contends that there is not substantial evidence to support the trial court's findings that Doe orally copulated defendant twice during the encounter, and therefore the sentence on count 8 or court 12 must be stayed.

The Attorney General contends that Doe testified that, on or between August 26 and 27, (1) she orally copulated defendant and (2) defendant orally copulated her. Based

on these two separate instances of oral copulation, the Attorney General argues that substantial evidence supports separate sentences for counts 8 and 12.

## 1. Trial Court Proceedings

In argument to the jury, the prosecutor twice referred to count 12, oral copulation with a child aged 10 or younger (§ 288.7, subd. (b)), as occurring when defendant "first entered the room and had [Doe] suck his penis, but not until the juice came out, to lubricate his penis." He "came into the room and . . . he spit on his penis to lubricate it, and then he put his penis in her mouth but didn't want the juice to come out." The prosecutor referred to count 8, aggravated sexual assault of a child under 14 by forcible oral copulation (§ 269, subd. (a)(4); former § 288a, subd. (c)(2)) as another instance of oral copulation that occurred during the same encounter.

In accordance with the prosecutor's argument, the caption of the verdict form for count 12, states, "COUNT 12 [¶] ORAL COPULATION WITH A CHILD 10 OR YOUNGER [¶] (First Act of Penis in Jane Doe's mouth)." The caption for the verdict form for count 8 states, "COUNT 8 [¶] AGGRAVATED SEXUAL ASSAULT OF A CHILD UNDER THE AGE OF 14, TO WIT; FORCIBLE ORAL COPULATION [¶] (penis in Jane Doe's mouth)." The verdict forms for both counts indicate that both offenses occurred on or between August 26, 2018, through August 27, 2018. Defendant was found guilty of both counts.

In a sentencing memorandum, the prosecutor contended section 654 did not apply to these two counts although they occurred during a single encounter. The prosecutor argued that at the beginning of the encounter, defendant put his penis in the victim's mouth (count 12), and towards the end of the encounter, he put his penis in her mouth again (count 8).

At the sentencing hearing, defendant contended that section 654 applied to counts 8 and 12 because they occurred "during one continuous sexual assault." The prosecutor responded that count 12 "was an act that was used against Jane Doe in the

very beginning, shortly after he entered her bedroom. And there was multiple, multiple acts and violence that occurred until the end of this attack." The prosecutor contended that "the very last act was an act of oral copulation" and that "the multiple acts in between, make Count[s] 12 and 8 separate occasions."

The trial court implicitly ruled that section 654 did not apply by finding that counts 8 and 12 were each "a separate incident" and "separate act" and by imposing consecutive sentences for the counts.

## 2. Analysis

"[M]ultiple sex acts committed on a single occasion can result in multiple statutory violations. Such offenses are generally 'divisible' from one another under section 654, and separate punishment is usually allowed. [Citations.]" (*People v. Scott* (1994) 9 Cal.4th 331, 344, fn. 6.) "If the rule were otherwise, 'the clever molester could violate his victim in numerous lewd ways, safe in the knowledge that he could not be convicted and punished for every act.' [Citation.] Particularly with regard to underage victims, it is inconceivable the Legislature would have intended this result. [Citation.]" (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1006.)

In this case, Doe testified at trial that she orally copulated defendant only once in her bedroom on the night that her vagina bled. It is not clear from her trial testimony when the oral copulation occurred in relation to the other sex acts that night.

However, other evidence admitted at trial indicates that Doe orally copulated defendant twice that night. The first instance appears to have occurred at or near the beginning of the encounter. When interviewed by a social worker,[5] the victim indicated that she orally copulated defendant "before he . . . started putting it in" her vagina during the encounter that resulted in her having "to go to the doctor." When the social worker

---

[5] A video recording of the social worker's interview of the victim was played during trial, and a transcript of the recording was admitted into evidence.

asked how it "start[ed]," the victim stated, "He wanted me to suck it, but he didn't want me to have the juice. He wanted me to just suck it, so it would slip in, but it didn't work." When the social worker clarified with the victim that defendant wanted the victim to oral copulate him before he put his penis in her vagina, the victim responded affirmatively. She indicated that she was "sucking it" for "just a little bit," that defendant "didn't want [her] to have the juice," and that he "wanted it to slip right through."

The second instance of Doe orally copulating defendant that night appears to have occurred at or near the end of the encounter. When interviewed by a police officer,[6] Doe indicated that there was blood everywhere, including on some of her favorite blankets. When asked by the officer whether defendant said "anything to [her] after," the victim reported that defendant told her that she needed to go to bed "[a]nd then he put juice in [her]." The officer asked what she meant, and she indicated that defendant put his penis in her mouth. When the police officer later returned to the subject of oral copulation, the officer asked, "Did you suck hard or did you suck on his penis that night?" The victim responded, "I sucked on his penis." The officer asked when and whether it was "that night that he put it in you." The victim responded affirmatively to the latter question. The officer then asked, "Was it before or after . . . ?" The victim indicated that it was "after."

In sum, notwithstanding the victim's trial testimony that she orally copulated defendant only once during the encounter that led to her vagina bleeding, the record reflects—consistent with the prosecutor's argument to the jury, the prosecutor's arguments to the court in connection with sentencing, and the caption of the verdict forms for counts 12 and 8—that (1) the victim orally copulated defendant at the beginning of the incident when she was not supposed to receive any "juice" and (2) she orally

---

[6] Video footage of the interview from the police officer's body camera was played during trial, and a transcript of the recording was admitted into evidence.

copulated him again at or near the end of the encounter during which he put "juice" in her. As substantial evidence supports the trial court's findings that the victim orally copulated defendant twice during the encounter, defendant fails to demonstrate that the court erred in refusing to stay the punishment for count 8 or court 12.

**F.** *Amended Section 654*

Defendant contends that the matter must be remanded for resentencing so that the trial court may exercise its discretion under recently amended section 654 to determine which counts to stay. The Attorney General concedes the issue. We find the Attorney General's concession appropriate.

Section 654 prohibits multiple punishment for a single act or omission. (See *People v. Delgado* (2017) 2 Cal.5th 544, 570.) At the time of defendant's sentencing, section 654 required the trial court to punish defendant "under the provision that provide[d] for the longest potential term of imprisonment." (§ 654, former subd. (a).)

Effective January 1, 2022, section 654 was amended by Assembly Bill No. 518 (2021-2022 Reg. Sess.) to give the trial court discretion to select the provision under which the defendant would be punished. As relevant here, section 654 now provides, "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a), italics added.)

The amendment of section 654 effected an ameliorative change to the law as trial courts are no longer required to impose sentence under the provision that provides for the longest term of imprisonment when a defendant is convicted of multiple crimes for a single act or omission. Thus, as the parties agree, defendant is entitled to the retroactive application of amended section 654 because there is no indication that the Legislature intended the law to apply prospectively only, and this case is not yet final on appeal. (See, e.g., *People v. Mani* (2022) 74 Cal.App.5th 343, 379-380; *People v. Sek* (2022) 74 Cal.App.5th 657, 673-674; *People v. Mendoza* (2022) 74 Cal.App.5th 843, 861-862.)

Defendant observes that in this case, the trial court stayed the punishment on counts 4, 5, 9, and 10 pursuant to former section 654. The prosecutor had recommended in a sentencing memorandum, and defendant had agreed at the sentencing hearing, that he should be punished on count 2 and that punishment should be stayed on several other counts, including counts 4 and 5 which provided for lesser punishment than count 2. The prosecutor also recommended, and defendant agreed, that he should be punished on count 8 or 12 and that the punishment on counts 9 and 10, which provided for the same or lesser punishment than counts 8 and 12, should be stayed. The court followed the parties' recommendations regarding staying counts 4, 5, 9, and 10. However, because amended section 654 now gives a trial court discretion to select the provision on which to impose punishment when a defendant is convicted of multiple crimes for a single act or omission, we will remand the matter for resentencing. On remand, the parties may address in the first instance whether amended section 654 applies to, for example, count 2.[7]

## G. *Sentence on Count 9*

Defendant contends that the matter should be remanded so that the trial court can "correct" the nine-year sentence on count 9, forcible lewd act, to eight years. The Attorney General concedes the issue. We find the concession appropriate.

---

[7] Defendant was convicted in count 2 of aggravated sexual assault of a child under the age of 14 by rape (§§ 269, subd. (a)(1), 261, subd. (a)(2)), and the jury found true the allegation that defendant personally inflicted bodily harm upon a child under the age of 14 pursuant to section 667.61, subdivisions (d)(7) and (j)(1). An appellate court recently held that a trial court does *not* have discretion under amended section 654 to suspend or stay a sentence under section 667.61. (*People v. Caparaz* (Jun. 30, 2022, No. A158473) ___Cal.App.5th___ [2022 Cal. App. LEXIS 579, *35]; § 667.61, subd. (h) ["Notwithstanding any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, a person who is subject to punishment under this section"].)

Defendant was convicted in count 9 of a violation of section 288, subdivision (b)(1) [forcible lewd act on a child under the age of 14]. Section 288, subdivision (b)(1) sets forth a sentencing range of five, eight, or 10 years. The probation report set forth this sentencing range. At the sentencing hearing, the trial court ordered the sentence for count 9 as follows: "As to Count 9, the 288(b), the Court imposes the midterm of nine years. Court does not find the factors in aggravation, factors in mitigation outweigh one another. The Court stays that pursuant to 654." Because the record reflects that the trial court intended to impose the "midterm" on count 9, and section 288, subdivision (b)(1) provides for a midterm sentence of eight years, we will remand the matter so that the court may correct its sentence on count 9 to eight years.

**H.** *Other Issues in the Abstract of Judgment*

Although not raised by the parties, we make the follow observations regarding possible errors concerning custody credits, defendant's convictions as listed in the abstract of judgment, and victim restitution, which the parties and/or the trial court may address on remand.

### 1. Custody Credits

According to the probation report, defendant was in presentence custody for 987 days. The probation officer calculated defendant's conduct credit as 148 days and calculated defendant's total custody credits as 1,135 days.

At the sentencing hearing, the trial court stated that defendant's actual time in custody was only 967 days, not 987 days as stated in the probation report, but the court still awarded 148 days of conduct credit for a purported total of 1,135 days of custody credits. Because we are remanding the matter for resentencing, the court will have the opportunity to properly determine defendant's custody credits.

### 2. Convictions on Counts 10 and 12

Defendant was convicted in counts 10 and 12 of oral copulation with a child aged 10 or younger (§ 288.7, subd. (b)). The abstract of judgment, however, indicates that

35

defendant was convicted in count 10 of sexual intercourse with a child and convicted in count 12 of sodomy with a child. On remand, the trial court will have the opportunity to correctly identify counts 10 and 12 in the abstract of judgment.

### 3. Victim Restitution

The probation report indicates that the victim's father sought $4,954 in restitution. The probation officer recommended that the trial court order this amount in victim restitution and that the court also "reserve[]" restitution because it was anticipated that counseling and medical issues for the victim would be ongoing.

At the sentencing hearing, defendant objected to the amount of restitution requested by the victim's father. The court retained jurisdiction over the amount of victim restitution and scheduled the matter for a restitution setting hearing on May 27, 2021.

In the meantime, the abstract of judgment, which is dated May 17, 2021, indicates that the trial court ordered $4,954 in victim restitution. The record on appeal does not reflect that the trial court ever ordered $4,954 in victim restitution. As we are remanding the matter for resentencing, and a victim restitution hearing may have since taken place, the court will have the opportunity to prepare an abstract of judgment that correctly states the ordered amount of victim restitution, if any.

### IV. DISPOSITION

The judgment is reversed. The trial court shall resentence defendant, applying the amended version of Penal Code section 654, correcting the sentence on count 9 (forcible lewd act on a child under the age of 14) by selecting the eight-year middle term (Pen. Code, § 288, subd. (b)(1)), and correcting any errors in the abstract of judgment.

36

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

DANNER, J.

_____

WILSON, J.

*People v. Sepulveda*
**H049107**